**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| QIAO SHIYAO, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>    v.<br><br>XIAO-I CORPORATION, HUI YUAN, WEI WENG, WENJING CHEN, XIAOMEI WU, JUN XU, ZHONG LIN, H. DAVID SHERMAN, AC SUNSHINE SECURITIES LLC, SBI CHINA CAPITAL FINANCIAL SERVICES LIMITED, PRIME NUMBER CAPITAL LLC, and GUOTAI JUNAN SECURITIES (HONG KONG) LIMITED,<br><br>       Defendants. | **Case No. 1:24-cv-07837-GHW**<br><br><br>**SECOND AMENDED CLASS <u>ACTION COMPLAINT</u>**<br><br>**Hon. Gregory H. Woods**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 8

SECURITIES ACT CLAIMS............................................................................................. 8

    PARTIES ................................................................................................................. 9

    UNDERWRITER LIABILITY ALLEGATIONS FOR THE SECURITIES ACT
    CLAIMS ................................................................................................................. 12

SUBSTANTIVE ALLEGATIONS ................................................................................... 13

    Background ............................................................................................................ 13

    A.    The IPO ....................................................................................................... 14

    B.    The Company's Registration Statement and 2022 20-F Report Omitted
        Material Facts Required to Be Stated Therein and Necessary to Make the
        Statements Therein Not Misleading Due to the Company's Failure to
        Comply with Section 210.5-03(b)(2) of Regulation S-X.................................... 14

    C.    The Company's Risk Disclosures in the Registration Statement and 2022
        20-F Report Regarding Circular 37 Were Materially Misleading and
        Violated Item 105 of Regulation S-K ........................................................... 25

    THE REGISTRATION STATEMENT OMITTED MATERIAL FACTS
    REQUIRED TO BE STATED THEREIN AND NECESSARY TO MAKE THE
    STATEMENTS THEREIN NOT MISLEADING .......................................................... 31

    THE TRUTH EMERGES ....................................................................................... 35

    PLAINTIFF'S CLASS ACTION ALLEGATIONS FOR THE SECURITIES
    ACT CLAIMS ....................................................................................................... 42

    SECURITIES ACT COUNTS ................................................................................ 43

        COUNT I ..................................................................................................... 43

        (Violations of Section 11 of the Securities Act Against the Securities Act
        Defendants) ................................................................................................. 43

        COUNT II .................................................................................................... 44

        (Violations of Section 15 of the Securities Act Against the Securities Act
        Individual Defendants)................................................................................. 44

EXCHANGE ACT CLAIMS ........................................................................................... 45

    PARTIES ................................................................................................................. 45

    MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED
    DURING THE EXCHANGE ACT CLASS PERIOD ................................................... 46

SCIENTER ALLEGATIONS SOLELY FOR THE EXCHANGE ACT CLAIMS......... 53

    A.    The Company Requires Huge Sums of Money for Research and
        Development and to Compete, and Was in Dire Straits and Desperate for
        Capital Prior to and after the IPO ........................................................................ 54

    B.    Additional Facts Supporting the Inference of Scienter........................................ 57

LOSS CAUSATION FOR PLAINTIFF'S EXCHANGE ACT CLAIMS ....................... 58

PLAINTIFF'S CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT
CLAIMS ......................................................................................................................... 59

SECURITIES EXCHANGE ACT COUNTS ................................................................. 62

    COUNT III.............................................................................................................. 62

    (Violations of Section 10(b) of the Exchange Act and Rule 10b-5
    Promulgated Thereunder Against the Exchange Act Defendants) ....................... 62

    COUNT IV.............................................................................................................. 65

    (Violations of Section 20(a) of the Exchange Act Against  the Exchange
    Act Individual Defendants)................................................................................... 65

PRAYER FOR RELIEF ...................................................................................................... 66

DEMAND FOR TRIAL BY JURY ..................................................................................... 66

Lead Plaintiff Qiao Shiyao ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Second Amended Complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Xiao-I Corporation ("Xiao-I" or the "Company"), reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of two classes of purchasers of Xiao-I American depository shares ("ADSs"), the Securities Act Class and the Exchange Act Class.

2.      The "Securities Act Class" includes the following: As to claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") (the "Securities Act Claims" or "Securities Act Counts"), all persons and entities other than Defendants, that purchased or otherwise acquired Xiao-I ADSs pursuant and/or traceable to the Registration Statement issued in connection with the Company's initial public offering conducted on or about March 9, 2023 (the "IPO" or "Offering"), and were damaged thereby.

3.      The "Exchange Act Class" includes the following: As to claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), all persons and entities other than Defendants, that purchased or otherwise acquired Xiao-I ADSs between March

9, 2023 and September 22, 2023, both dates inclusive (the "Exchange Act Class Period"), and were damaged thereby.

4. Xiao-I, through its subsidiaries, operates as a global artificial intelligence ("AI") company. The Company is incorporated in the Cayman Islands and headquartered in the People's Republic of China (the "PRC" or "China"). As a holding company with no material operations of its own, Xiao-I conducts most of its operations through its subsidiary Shanghai Xiao-I Robot Technology Co., Ltd. ("Shanghai Xiao-i"), which comprises the Company's AI business.

5. According to Xiao-I, "Shanghai Xiao-i has become a leading [AI] company by building on its wide technology commercialization, brand recognition and culture of innovation in China." Leading up to and following the IPO, Xiao-I consistently represented that Shanghai Xiao-i's purported industry-leading AI technologies and robust research and development resources distinguished the Company from its competitors.

6. On December 20, 2022, Xiao-I filed a registration statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on March 8, 2023 (the "Registration Statement").

7. On or about March 9, 2023, Xiao-I conducted its IPO, issuing 5.7 million of its ADSs to the public at the Offering price of $6.80 per ADS for proceeds of over $36 million to the Company after applicable underwriting discounts and commissions, and before expenses.

8. On March 13, 2023, Xiao-I filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

9. The Registration Statement and the Company's 2022 annual report filed on Form 20-F on April 28, 2023 (the "2022 Annual Report" or "2022 20-F") failed to disclose Xiao-I's costs of revenues by product or service revenue class, which was an omission in contravention of

an affirmative legal disclosure obligation pursuant to Section 210.5-03(b)(2) of Regulation S-X. (Regulation S-X is a SEC regulation under the Securities Act that outlines how registrants must report and disclose information relating to financial statements on registration statements, periodic reports, and other filings.)

10.    The information required to be disclosed pursuant to Section 210.5-03(b)(2) of Regulation S-X allows investors to make determinations about an entity's gross margin in each particular product or service line from which it generates substantive revenues.  Gross margin is calculated as the difference between net sales and the direct costs incurred by a company to effectuate those sales – such as the cost of the goods sold or the direct cost of services – apart from overhead, non-cash expenses, and other operating expenses that an entity incurs when operating its business.  When an entity is producing goods, it incurs costs of (tangible) goods sold.  When an entity is providing services, it incurs costs of sales.  Gross margin is an important financial metric to investors because it provides unfiltered insight into whether an entity has the ability to make money from the very thing it purports to be in business to do – produce goods or provide services. This measure is especially important for Emerging Growth Companies ("EGC"s), like Xiao-I, because while such entities may be subject to non-recurring start-up, research and development, or marketing expenses to get the endeavor off the ground, as well as associated capital expenditures, gross margin provides insight into whether the business endeavor itself – i.e., the producing of products or the provision of services – is indeed profitable and may be expected to be in the long run.

11.    The Company's failure to disclose pertinent gross margin measures by product or service revenue class (i.e., metrics that would otherwise be considered key performance indicators for a company, especially an EGC) left investors in the dark as to which of Xiao-I's revenue

3

segments were least/most profitable (which was the essence of the required disclosure under Section 210.5-03(b)(2) of Regulation S-X) and called into question whether management and the Board of Directors had been/were being transparent about the direction of the Company. Additionally, the omission of such material facts rendered the Company's affirmative statements regarding "cost of revenues" mere "half-truths" and, therefore, materially misleading.

12.    Under Xiao-I and its subsidiaries' organizational structure, the Company transfers cash and other assets between itself and Shanghai Xiao-i through various intermediaries.  The Company's ability to do so, however, is limited as a result of certain of its Chinese shareholders' non-compliance with applicable foreign exchange rules promulgated by China's State Administration of Foreign Exchange ("SAFE"), particularly the "Circular on Issues Concerning Foreign Exchange Administration over the Overseas Investment and Financing and Roundtrip Investment by Domestic Residents via Special Purpose Vehicles" ("Circular 37").  Circular 37 imposes certain registration requirements on Chinese residents that contribute domestic assets or interests to offshore companies, known special purpose vehicles ("SPVs"), as well as on foreign investment enterprises established by way of round-tripping ("Circular 37 Registration").

13.    As stated in the Registration Statement and 2022 20-F, the Company was aware that, prior to the IPO, some of its shareholders were not in compliance with Circular 37, which subjected the Company to various risks, including restrictions on its ability to receive registered capital.

14.    The Registration Statement and 2022 20-F contained materially misleading statements that failed to disclose the true scope and severity of risks that Xiao-I faced due to certain of its Chinese shareholders' non-compliance with Circular 37 Registration, including the Company's potential inability to use the IPO proceeds for its intended business purposes, such as

research and development which is crucial in the AI business.  Additionally, Defendants' failure to disclose the true scope and severity of risks that Xiao-I faced due to certain of its Chinese shareholders' non-compliance with Circular 37 Registration violated Item 105 of SEC Regulation S-K, which required Xiao-I to provide under the caption "Risk Factors" a discussion of the material factors that make an investment in the Company or offering speculative or risky and concisely explain how each risk affects the Company or the securities being offered.

15.    On July 27, 2023, the SEC issued a letter to Xiao-I regarding the 2022 20-F (the "SEC Letter").  The SEC Letter took issue with the Company's failure to comply with Section 210.5-03(b)(2) of Regulation S-X in preparing its financial statements included in the 2022 20-F. With respect to technology development services, the letter also asked why technology development services was not included as a separate line of business in the Registration Statement but was included separately, just a month later, in the Company's 2022 20-F.

16.    The SEC Letter also requested more explicit disclosures in the 2022 20-F risk factors section concerning certain of the Company's Chinese shareholders' non-compliance with Circular 37 Registration, particularly with respect to the Company's potential inability to use IPO proceeds for its intended business purposes.

17.    In response to the SEC letter, the Company filed an amended annual report on Form 20-F/A on August 10, 2023 (the "Amended 2022 20-F").  The Amended 2022 20-F disclosed the required revenues and cost of revenue information pursuant to Regulation S-X for the years ended December 31, 2020, 2021 and 2022 – reflected across five revenue classes identified by Xiao-I itself: (i) Sale of software products; (ii) Sale of hardware products; (iii) Technology development service; (iv) M&S service; and (v) Sale of cloud platform products.  The Amended 2022 20-F afforded newfound insight into the Company's revenues, expenses, and, thereby, gross margins *by*

*revenue class*, information not otherwise known or discernible by investors for the periods presented. It revealed that the gross margins for the Company's technology development services line of business were significantly lower than the gross margins for its sale of software products for the periods presented. For example, after the expanded disclosure, investors were able to discern that for 2021, the gross margin for the sale of software products was 94.82% compared to 52.52% for technology development services.

18. This is particularly notable in view of the August 10, 2023 letter the Company also filed in response to the SEC letter. The letter disclosed that the lower margin technology development services line of business "represent[s] the Company's future revenue growth source," despite the lower gross margins now known to investors.

19. Investors likely viewed the August 10, 2023 disclosures as a shift in part regarding the Company's primary revenue sources – from a higher margin products line of business to a lower margin services line of business, and wondered whether management and the Board had been/were being transparent about the direction of the Company.

20. The Amended 2022 20-F also clarified the risk factor regarding PRC resident shareholders' non-compliance with Circular 37 Registration and the potential inability to use the IPO proceeds. The Amended 2022 20-F states:

> WFOE may be unable to open a new capital account with relevant banks within China according to their internal control policies and may be restricted from remitting funds or handling other foreign exchange businesses within China unless and until we remediate the non-compliance [with Circular 37 Registration]. However, WFOE has successfully opened a new capital account with Bank of Ningbo recently. Apart from a small amount of the IPO proceeds reserved for overseas use, we were able to transfer the rest of the IPO proceeds from overseas to WFOE for VIE's product development and operations through both WFOE's new capital account with Bank of Ningbo and WFOE's pre-existing capital account with Agricultural Bank of China where WFOE has reserved foreign exchange quota.

6

21.     The exchange between Xiao-I and the SEC regarding the Company's Circular 37 risk disclosure cast doubt on the Company's transparency and negatively affected investor confidence, notwithstanding the news about the Company's ability to use the IPO proceeds.

22.     As a result of the above-referenced disclosures, Xiao-I's ADS price[1] fell $3.07 per ADS over the following two trading days, or 38%, to close at $4.97 per ADS on August 14, 2023.

23.     On September 25, 2023, the Company filed a Form 6-K along with a press release announcing its quarterly results for the six months ended June 30, 2023.  Revenues and cost of revenues for the first six months of 2022 and 2023 were disclosed in the press release.  The press release also afforded newfound insight into the Company's gross margins by revenue class, information not otherwise known or discernible by investors for the periods presented.  The disclosures on September 25, 2023 show that for the six months ending June 30, 2022, while Xiao-I reported higher revenues from "technology development services" than in "sales of software products," the gross margin was significantly higher in "sales of software products."  The gross margin from the sale of software products was 87.81% compared to 57.73% for technology development services for the same period.

24.     On this news, Xiao-I's ADS price fell $0.30 per ADS, or 14.22%, to close at $1.81 per ADS on September 25, 2023.

25.     As of the time this action was filed, Xiao-I ADSs continued to trade below its IPO price, damaging investors.

26.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline

---

[1] Xiao-I's historical closing ADS prices and their declines in value, as referenced herein, reflect their prices *prior to* a change that the Company effected in the ratio of its ADSs to its ordinary shares that had the same effect as a one-for-nine reverse ADS split, which took effect on August 23, 2024, *after* the Exchange Act Class Period.

in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77o), as well as Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Xiao-I ADSs trade on the Nasdaq Stock Market ("NASDAQ"), which is located in this District.

30.     In connection with the acts alleged in this Second Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## SECURITIES ACT CLAIMS

31.     The Securities Act Claims are based solely on negligence and strict liability, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of the Securities Act Defendants (defined below) – i.e., the Securities Act Claims do not allege, arise from, or sound in, fraud.  Plaintiff specifically disclaims any allegation of fraud, scienter, or recklessness in these non-fraud claims.  All of the sources used in the Second Amended Complaint to support Plaintiff's Securities Act Claims have been introduced solely for the purpose of showing that Xiao-I's

8

Registration Statement in connection with the IPO omitted material facts required to be stated therein and necessary to make the statements therein not misleading.

## PARTIES

32.    Plaintiff, as set forth in her previously filed Certification (ECF No. 27-3), purchased or otherwise acquired Xiao-I ADSs pursuant and/or traceable to the Registration Statement issued in connection with the IPO, and suffered damages as a result of the federal securities laws violations.

33.    Defendant Xiao-I is incorporated in the Cayman Islands with principal executive offices located at 5/F, Building 2, No. 2570, Hechuan Road, Minhang District, Shanghai, China 201101.  The Company's ADSs trade in an efficient market on the NASDAQ under the ticker symbol "AIXI."

34.    Defendant Hui Yuan ("Yuan") has served as Xiao-I's Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") at all relevant times.  Defendant Yuan signed or authorized the signing of the Registration Statement filed with the SEC.

35.    Defendant Wei Weng ("Weng") has served as Xiao-I's Chief Financial Officer at all relevant times.  Defendant Weng signed or authorized the signing of the Registration Statement filed with the SEC.

36.    Defendant Wenjing Chen ("Chen") has served as a Director on Xiao-I's Board at all relevant times.  Defendant Chen signed or authorized the signing of the Registration Statement filed with the SEC.

37.    Defendant Xiaomei Wu ("Wu") was named as a Director-nominee of Xiao-I at the time of the IPO.  Defendant Wu signed or authorized the signing of a written consent, filed with the Registration Statement pursuant to the SEC's Rule 438 promulgated under the Securities Act

9

(17 C.F.R. § 230.438) ("Rule 438"), to be named as a Director-nominee in the Registration Statement.

38.     Defendant Jun Xu ("Xu") was named as a Director-nominee of Xiao-I at the time of the IPO.  Defendant Xu signed or authorized the signing of a written consent, filed with the Registration Statement pursuant to Rule 438, to be named as a Director-nominee in the Registration Statement.

39.     Defendant Zhong Lin ("Lin") was named as a Director-nominee of Xiao-I at the time of the IPO.  Defendant Lin signed or authorized the signing of a written consent, filed with the Registration Statement pursuant to Rule 438, to be named as a Director-nominee in the Registration Statement.

40.     Defendant H. David Sherman ("Sherman") was named as a Director-nominee of Xiao-I at the time of the IPO.  Defendant Sherman signed or authorized the signing of a written consent, filed with the Registration Statement pursuant to Rule 438, to be named as a Director-nominee in the Registration Statement.

41.     Defendants Yuan, Weng, Chen, Wu, Xu, Lin, and Sherman are collectively referred to herein as the "Securities Act Individual Defendants."

42.     As directors, executive officers, and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Xiao-I ADSs in the IPO for their own benefit and the benefit of the Company.  The Securities Act Individual Defendants were key members of the IPO working group and executives of the Company who pitched investors to purchase the shares sold in the IPO.

43.     Defendant Prime Number Capital LLC ("Prime") is an investment banking firm specializing in initial public offerings, among other things.  Prime was an underwriter in

10

connection with the IPO and acted as "representative of the underwriters," "sole global coordinator, lead left underwriter, and lead book-running manager." Prime assisted in the drafting and dissemination of the Registration Statement. Prime's address is 12 E. 49th Street, Floor 27, New York, New York 10017.

44.     Defendant AC Sunshine Securities LLC ("Sunshine") provides investment banking services and specializes in initial public offerings, among other things. Sunshine acted as co-managing underwriter in connection with the IPO. Sunshine assisted in the drafting and dissemination of the Registration Statement. Sunshine's address is 200 E. Robinson Street, Suite 295, Orlando, Florida 32801.

45.     Defendant Guotai Junan Securities (Hong Kong) Limited ("Guotai") operates as a brokerage company. Guotai acted as joint underwriter in connection with the IPO. Guotai assisted in the drafting and dissemination of the Registration Statement. Guotai's address is 26F-28F, Low Block, Grand Millennium Plaza, 181 Queen's Road Central, Hong Kong.

46.     Defendant SBI China Capital Financial Services Limited ("SBI") operates as a financial services company. SBI acted as co-managing underwriter in connection with the IPO. SBI assisted in the drafting and dissemination of the Registration Statement. SBI's address is 4/F, Henley Building, No. 5 Queen's Road Central, Hong Kong.

47.     Defendants Prime, Sunshine, Guotai and SBI are collectively referred to herein as the "Securities Act Underwriter Defendants."

48.     Defendants Xiao-I, the Securities Act Underwriter Defendants, and the Securities Act Individual Defendants are collectively referred to herein as the "Securities Act Defendants" or "Defendants."

11

## UNDERWRITER LIABILITY ALLEGATIONS FOR THE SECURITIES ACT CLAIMS

49.     Pursuant to the Securities Act, the Securities Act Underwriter Defendants are liable because the Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

50.     The Securities Act Underwriter Defendants are investment banking houses or brokerage firms that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared in over $2.7 million dollars in fees collectively.

51.     The Securities Act Underwriter Defendants obtained an agreement from Xiao-I that Xiao-I would indemnify and hold the Securities Act Underwriter Defendants harmless from liability under the federal securities laws.

52.     Representatives of the Securities Act Underwriter Defendants also assisted Xiao-I in planning the IPO, and purportedly conducted a reasonable investigation into the business and operations of Xiao-I, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Securities Act Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Securities Act Underwriter Defendants had access to internal, confidential, current corporate information concerning Xiao-I's most up-to-date operational and financial results and prospects.

53.     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Securities Act Underwriter Defendants reached understandings with Xiao's top executives as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Xiao-I's ADSs would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Xiao-I's business and operations would be

12

made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

54.    The Registration Statement was negligently prepared and, as a result, omitted to state material facts both required to be stated therein and necessary to make the statements therein not misleading.

55.    None of the Securities Act Underwriter Defendants made a reasonable investigation as to whether the Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

56.    A reasonable investigation by the Securities Act Underwriter Defendants would have revealed that the Registration Statement omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading.

57.    The Securities Act Underwriter Defendants' failure to conduct a reasonable investigation was a substantial factor leading to the harm complained of herein.

58.    The Securities Act Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Securities Act Class.

### SUBSTANTIVE ALLEGATIONS

#### Background

59.    Xiao-I, through its subsidiaries, operates as a global AI company.  The Company is incorporated in the Cayman Islands and headquartered in China.  As a holding company with no material operations of its own, Xiao-I conducts most of its operations through its subsidiary Shanghai Xiao-i, a variable interest entity ("VIE") in China that comprises the Company's AI business.

60.    According to Xiao-I, "Shanghai Xiao-i has become a leading [AI] company by

13

building on its wide technology commercialization, brand recognition and culture of innovation in China." Leading up to and following the IPO, Xiao-I consistently represented that Shanghai Xiao-i's purported industry-leading AI technologies and robust R&D resources distinguished the Company from its competitors.

### A.       The IPO

61.       On December 20, 2022, Xiao-I filed the Registration Statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on March 8, 2023.[2]

62.       On or about March 9, 2023, Xiao-I conducted its IPO, issuing 5.7 million of its ADSs to the public at the Offering price of $6.80 per ADS for proceeds of over $36 million to the Company after applicable underwriting discounts and commissions, and before expenses.

63.       On March 13, 2023, Xiao-I filed the Prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

### B.       The Company's Registration Statement and 2022 20-F Report Omitted Material Facts Required to Be Stated Therein and Necessary to Make the Statements Therein Not Misleading Due to the Company's Failure to Comply with Section 210.5-03(b)(2) of Regulation S-X

64.       The Registration Statement contained financial statements for the Company, including the Company's consolidated financial statements for the years ended December 31, 2020 and 2021, as well as for the six months ended June 30, 2021 and June 30, 2022.

65.       The Registration Statement states that the Company has four lines of business from which it generates revenue, including: (i) the sale of software products and service;

---

[2] Xiao-I is purportedly an emerging growth company under applicable U.S. federal securities laws, as defined in the Jumpstart Our Business Startups Act of 2012.

14

(ii) maintenance and support ("M&S") service; (iii) the sale of hardware products; and (iv) the sale of cloud platform products.

66.    The Company's: (i) sale of software products and service consists of "software products sold to customers comprising customized software products for specific needs" – i.e., the sale of products and, seemingly, the provision of services; (ii) M&S service is "for software products contracts and consists of unspecified future software updates, upgrades, and enhancements as well as technical product support services, and the provision of unspecified updates and upgrades" – i.e., the provision of services; (iii) sale of hardware products line consists of "[h]ardware products sold to customers comprising the hardware designed for specific needs" – i.e., the sale of products; and (iv) sale of cloud platform products consists "of standardized software products uploaded to the [Company's] cloud platform" – i.e., the sale of products.

67.    Regulation S-X is an SEC regulation under the Securities Act that outlines how registrants must report and disclose information relating to financial statements on registration statements, periodic reports, and other filings.

68.    Section 210.5-03 of Regulation S-X is entitled "Statements of comprehensive income" and "the purpose of this rule is to indicate the various line items which, if applicable, … should appear on the face of the statements of comprehensive income filed…." 17 C.F.R. § 210.5(a).

69.    Section 210.5-03 of Regulation S-X directs issuers to separately disclose revenue from five specified classes of revenue if those classes, or some logical or operational interpretation thereof, constitute more than 10% of the sum of the revenue classes. *See* 17 C.F.R. § 210.5(b).[3] These classes include: "(a) ***Net sales of tangible products*** (gross sales less discounts, returns and

---

[3] The sum of the revenue classes is net revenues.

allowances), (b) operating revenues of public utilities or others; (c) income from rentals; (d) *revenues from services*; and (e) other revenues." 17 C.F.R. § 210.5-03(b)(1) (emphasis added).

70. When such breakdown is required pursuant to Section 210.5-03 of Regulation S-X, Section 210.5-03(b)(2) of Regulation S-X additionally requires issuers to disclose the costs and expenses associated with each distinct class. Indeed, Section 210.5-03(b)(2) of Regulation S-X specifically asks filers to "[s]tate separately" in the issuer's statement of comprehensive income "the amount of (a) *cost of tangible goods sold*, (b) operating expenses of public utilities or others, (c) expenses applicable to rental income, (d) *cost of services*, and (e) *expenses applicable to other revenues.*" 17 C.F.R. § 210.5-03(b)(2) (emphasis added).

71. Apart from hardware sales, which constituted less than 10% of the Company's revenue for the years ended December 31, 2020 and 2021, and for the six months ended June 30, 2022, the Company's revenue classes that constituted more than 10% of the sum of the revenue classes for these periods originated from *two classes* – (i) revenues from the sale of software products (which are tangible products or goods); and (ii) revenues from services. *See* ¶¶82-83, 85 (regarding the Company's Amended 2022 20-F and September 25, 2023 Form 6-K).[4]

72. Consequently, Section 210.5-03 of Regulation S-X mandated that the Company separately disaggregate revenue and costs for at least these two classes. Furthermore, the Company's own nomenclature for the largest of these classes – "sales of software products and service" – is not apparently comprised of the sale of products or the sale of services but instead, both of those things.

---

[4] Notably, the Company self-identified and self-selected the revenue classes to disclose in these SEC filings, pursuant to the SEC letter and its suggestion that the Company consider Section 210 of Regulation S-X, which reflects the Company's own interpretation of Section 210.5-03 of Regulation S-X.

73.     This required information allows investors to make determinations about the gross margin in an entity's particular product or service revenue classes.  Gross margin is calculated as the difference between net sales and the direct costs incurred by a company to effectuate those sales – such as the cost of the goods sold or the direct cost of services – apart from overhead, non-cash expenses, and other operating expenses that an entity incurs when operating its business. When an entity is producing goods, it incurs costs of (tangible) goods sold.  When an entity is providing services, it incurs costs of sales.

74.     Gross margin is an important financial metric to investors because it provides unfiltered insight into whether an entity has the ability to make money from the very thing it purports to be in business to do – produce goods, or provide services.  This measure is especially important for EGCs, like Xiao-I,  because while such entities may be subject to non-recurring start-up, research and development, or marketing expenses to get the endeavor off the ground, as well as associated capital expenditures, gross margin provides insight into whether the business endeavor itself – i.e., the making of products or the provision of services – is indeed profitable and may be expected to be in the long run.

75.     To that end, the Financial Accounting Standards Board ("FASB"), in its Master Glossary, defines "gross margin" as the "excess of sales over cost of goods sold," and which "does not consider operating expenses."  In Accounting Standards Codification No. ("ASC") 220, *Income Statement - Reporting Comprehensive Income*, the FASB states that "[i]f used with related disclosures and other information in the financial statements, the information provided by reporting comprehensive income should assist investors, creditors, and others in assessing an entity's activities and entity's future cash flows." ASC 220-10-10-2.

17

76.     Despite the clear requirements of Section 210.5-03(b)(2) of Regulation S-X set forth above, and the foundational elements separately set out by the FASB, Xiao-I failed to include cost of revenues by product or service revenue class in the financial statements set forth in the Registration Statement, which was a material omission in contravention of an affirmative legal disclosure obligation. Additionally, such omission caused the affirmative statements regarding "cost of revenues" therein to be misleading half-truth statements.  The Company's Consolidated Statements of Operations and Comprehensive Income for the years ended December 31, 2020, and December 31, 2021, appeared as follows in the Registration Statement:

**XIAO-I CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE (LOSS)/INCOME**
**(In U.S. dollars, except for share and per share data, or otherwise noted)**

|  | For the years ended December 31, | |
| --- | --- | --- |
|  | **2020** | **2021** |
|  | **Restated (Note 18)** | **Restated (Note 18)** |
| Net revenues[5] | $   13,856,734 | $   32,524,013 |
| Cost of revenues[6] | (7,228,046) | (10,885,731) |
| **Gross profit** | **6,628,688** | **21,638,282** |
|  |  |  |
| Operating expenses: |  |  |
| Selling expenses | (4,566,760) | (4,620,113) |
| General and administrative expenses | (5,694,785) | (6,657,251) |
| Research and development expenses | (4,236,723) | (5,363,909) |
| **Total operating expenses** | **(14,498,268)** | **(16,641,273)** |
|  |  |  |
| **(Loss)/income from operations** | **(7,869,580)** | **4,997,009** |

[5] Although the Company did not disclose revenue by product or service in the consolidated statement of income in accordance with Section 210.5-03(b)(1) of Regulation S-X, the breakdown of revenue information is disclosed elsewhere in the Registration Statement.

[6] As stated above, the Company's failure to disclose Xiao-I's cost of revenues by product or service revenue class was a material omission in contravention of an affirmative legal disclosure obligation—i.e. Section 210.5-03(b)(2) of Regulation S-X. Additionally, such omission caused these affirmative statements regarding "cost of revenues" to be misleading half-truth statements.

18

77.     The Registration Statement also contained the Company's Condensed Consolidated

Statements of Operations and Comprehensive Income for the six months ended June 30, 2021 and

June 30, 2022, which appeared as follows:

**XIAO-I CORPORATION**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND**
**COMPREHENSIVE (LOSS)/INCOME**
**(In U.S. dollars, except for share and per share data, or otherwise noted)**

| | For the six months ended June 30, | |
| --- | --- | --- |
| | **2021** | **2022** |
| | **(Unaudited)** | **(Unaudited)** |
| Net revenues | $  8,874,070 | $  12,859,481 |
| Cost of revenues[7] | (3,598,319) | (3,720,705) |
| **Gross profit** | **5,275,751** | **9,138,776** |
| | | |
| Operating expenses: | | |
| Selling expenses | (2,205,736) | (2,094,124) |
| General and administrative expenses | (3,598,496) | (1,725,928) |
| Research and development expenses | (2,692,321) | (3,669,196) |
| **Total operating expenses** | **(8,496,553)** | **(7,489,248)** |
| **(Loss)/income from operations** | **(3,220,802)** | **1,649,528** |

78.     On April 28, 2023, Xiao-I filed an annual report on Form 20-F with the SEC,

reporting the Company's financial and operating results for the quarter and year ended December

31, 2022 (the "2022 20-F" or "2022 Annual Report"). The 2022 20-F also failed to comply with

Section 210.5-03(b)(2) of Regulation S-X by failing to report the Company's costs of revenues by

---

[7] Again, the Company's failure to disclose Xiao-I's cost of revenues by product or service revenue class was an omission in contravention of an affirmative legal disclosure obligation—i.e. Section 210.5-03(b)(2) of Regulation S-X. Additionally, such omission caused these affirmative statements regarding "cost of revenues" to be misleading half-truth statements.

product or service revenue class.  Instead, the Company disclosed revenues and cost of revenues as follows:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2021** | **2022** |
| Sale of software products | $5,098,730 | $14,878,256 | $3,547,113 |
| Sale of hardware products | 415,723 | 75,011 | 46,295 |
| Technology development service | 6,404,394 | 9,246,992 | 16,419,889 |
| M&S service | 1,937,887 | 2,772,795 | 2,429,526 |
| Sale of cloud platform products | - | 5,550,959 | 25,742,135 |
| Net revenues (including sales to related parties of $2,449,560, $286,875 and nil for the years ended December 31, 2020, 2021 and 2022, respectively) | 13,856,734 | 32,524,013 | 48,184,958 |
| Cost of revenues | (7,228,046) | (10,885,731) | (17,379,144) |
| **Gross profit** | **6,628,688** | **21,638,282** | **30,805,814** |

79.     Notably, this disclosure highlights that in 2020, three identifiable revenue classes constituted more than 10% of the sum of all the revenues (two of which suggest they were service-type revenues, and one of which related to the sale of products).  In 2021, there were again three identifiable revenue classes that constituted more than 10% of the sum of all the revenues (two of which suggest they related to the sale of products, and one of which seemed to represent service-type revenues).  Then, in 2022, there were two identifiable revenue classes that constituted more than 10% of the sum of all the revenues (one of which was for services, and one of which was for the sale of products).  When taken together with the other accounts, there would still be a "products" revenue class and a "services" revenue class that were greater than 10% of total revenues in the period.

80.     In the 2022 20-F, which was filed a month after the Registration Statement, the Company separated the "sale of software products and services" line of business (discussed in ¶¶65-66 herein), into two separate lines of business – "sale of software products" and "sale of technology development services" – highlighting the point made above that this category was

20

previously comprised of ***both*** products- and service-focused sources.  According to the 2022 20-F, "technology development services" comprises customized technology development services for specific needs of customers.

81.    On July 27, 2023, the SEC issued a letter to Xiao-I regarding the 2022 20-F.  The SEC Letter took issue with the Company's reported financial statements, and suggested the Company look to Section 210.5-03(b)(2) of Regulation S-X to amend and expand the disclosures in the financial statements included in the 2022 20-F.  With respect to technology development services, the letter also asked why technology development services was not included as a separate line of business in the Registration Statement but was included separately, just a month later, in the Company's 2022 20-F filed on April 28, 2023.

82.    In response to the SEC letter, the Company filed an amended annual report on Form 20-F/A on August 10, 2023 (the "Amended 2022 20-F").  The Amended 2022 20-F disclosed revenues and cost of revenue as follows:

|  | For the years ended December 31, | | |
| --- | --- | --- | --- |
|  | **2020** | **2021** | **2022** |
| Sale of software products | $5,098,730 | $14,878,256 | $3,547,113 |
| Sale of hardware products | 415,723 | 75,011 | 46,295 |
| Technology development service | 6,404,394 | 9,246,992 | 16,419,889 |
| M&S service | 1,937,887 | 2,772,795 | 2,429,526 |
| Sale of cloud platform products | - | 5,550,959 | 25,742,135 |
| Net revenues (including sales to related parties of $2,449,560, $286,875 and nil for the years ended December 31, 2020, 2021 and 2022, respectively) | 13,856,734 | 32,524,013 | 48,184,958 |
| Cost of sale of software products | (2,148,758) | (771,293) | (888,220) |
| Cost of sale of hardware products | (276,261) | (29,970) | (25,141) |
| Cost of technology development service | (3,604,014) | (4,390,825) | (12,194,044) |
| Cost of M&S service | (1,199,013) | (1,862,483) | (1,255,973) |
| Cost of Sale of cloud platform products | - | (3,831,160) | (3,015,766) |
| Cost of revenues | (7,228,046) | (10,885,731) | (17,379,144) |
| **Gross profit** | **6,628,688** | **21,638,282** | **30,805,814** |

83.     The Amended 2022 20-F afforded newfound insight into the Company's gross margins by revenue class, information not otherwise known or discernible by investors for the periods presented.  It revealed both that the line item previously referred to as "sale of software products and service" was actually comprised of two types of revenue classes expressly identified in Section 210.5-03 of Regulation S-X, and that the gross margins for the Company's technology development services line of business were significantly lower than the gross margins for its sale of software products for the periods presented.  For example, the gross margin for the sale of software products was 94.82% for 2021, compared to 52.52% for technology development services for the same period.

84.     The Company's August 10, 2023 letter in response to the SEC letter separately disclosed that the lower margin technology development services line of business "represent[s] the Company's future revenue growth source."  The letter states, in relevant part (emphasis added):

In 2022, together with a better reputation in the AI industry, we served more customers to provide technology development services. For the year ended

22

December 31, 2022, the revenue generated from technology development services was of $16.4 million, increased by 77% from $9.2 million in 2021. ***Technology development services also represent the Company's future revenue growth source.*** Therefore, we believe it is significant enough and necessary to change the presentation of the revenue breakdown to include revenue from technology development services as a separate line item, which will be more accurate for investors to understand the Company's business focus and strategy.

85.    On September 25, 2023, the Company filed a Form 6-K with a press release announcing its quarterly results for the six months ended June 30, 2023. Following the lead of the Amended 2022 20-F and reaffirming the Company's own interpretation of the requirements of Sections 210.5-03 and 210.5-03(b)(2) of Regulation S-X, the press release also afforded newfound insight into the Company's gross margins by revenue class, information not otherwise known or discernible by investors for the periods presented.  Revenues and cost of revenues for the first six months of 2022 and 2023 were disclosed as follows:

| | For the six months ended June 30, | |
| --- | --- | --- |
| | 2022 | 2023 |
| Sale of software products | $ 1,397,996 | $    535,004 |
| Sale of hardware products | 18,431 | 30,175 |
| Technology development service | 6,296,844 | 1,763,797 |
| M&S service | 1,497,871 | 1,426,784 |
| Sale of cloud platform products | 3,648,339 | 22,719,659 |
| **Net revenues** | **12,859,481** | **26,475,419** |
| Cost of sale of software products | (170,377) | (368,021) |
| Cost of sale of hardware products | (12,545) | (26,118) |
| Cost of technology development service | (2,661,707) | (1,286,290) |
| Cost of M&S service | (339,213) | (805,948) |
| Cost of sale of cloud platform products | (536,863) | (3,519,521) |
| **Cost of revenues** | **(3,720,705)** | **(6,005,898)** |
| **Gross profit** | **9,138,776** | **20,469,521** |

86.    The disclosures on September 25, 2023, show that for the six months ending June 30, 2022, while Xiao-I reported higher revenues from "technology development services" than in "sales of software products," the gross margin was significantly higher in "sales of software

23

products." The gross margin from the sale of software products was 87.81% compared to 57.73% for technology development services for the same period.

87.     The Company's failure to disclose the cost of revenues information required by Section 210.5-03(b)(2) of Regulation S-X prior to amending its 2022 20-F as of and for the year ended December 31, 2022 (as well as for purposes of reporting its results for the six months ended June 30, 2022, and 2021, on September 25, 2023) made the financial statements included in the Registration Statement and 2022 20-F misleading to investors because it left them without required transparency regarding the embedded gross margin information by revenue class, as well as the direction of the Company with respect to its varied revenue streams, and an unduly favorable picture of the Company's business. The gross margins for each segment of the Company's business were as follows:

| Sector | Full Year 2020 | Full Year 2021 | Six Months Ending June 30, 2022 |
|---|---|---|---|
| **Sale of Software Products** | 57.86% | 94.82% | 87.81% |
| **Sale of Hardware Products** | 33.55% | 60.05% | 31.94% |
| **Technology Development Services** | 43.73% | 52.52% | 57.73% |
| **M&S Service** | 38.13% | 32.83% | 77.35% |
| **Sale of Cloud Platform Products** | N/A | 30.98% | 85.28% |

88.     As reflected in the table above, the gross margin for software products was 87.81% for the six months ending June 30, 2022, compared to 57.73% for technology development services for the same period. Given that 210.5-03(b)(2) of Regulation S-X required the Company to separately disclose the costs of revenues by product or service revenue class, and there is a large

disparity in the costs of revenues across Xiao's varied revenue streams, investors would have considered this information to be material in making investment decisions about the Company. The foregoing information was and would have been further material to investors in view of Xiao-I's separate disclosure to the SEC that technology development services represented the Company's future revenue growth source.

89.    The Company's failure to disclose pertinent gross margin measures by product or service revenue class (i.e., metrics that would otherwise be considered key performance indicators for a company, especially an EGC) left investors in the dark as to which of Xiao-I's revenue segments were least/most profitable (which was the essence of the required disclosure under Section 210.5-03(b)(2) of Regulation S-X) and called into question whether management and the Board had been/were being transparent about the direction of the Company.  Additionally, the omission of such material facts rendered the Company's affirmative statements regarding "costs of revenues" mere half-truths and, therefore, materially misleading.

**C.    The Company's Risk Disclosures in the Registration Statement and 2022 20-F Report Regarding Circular 37 Were Materially Misleading and Violated Item 105 of Regulation S-K**

90.    Xiao-I has the full and exclusive right to manage and direct all cash flow and assets of Shanghai Xiao-i and to direct and administrate its financial affairs and daily operation.  This is accomplished via a series of contractual arrangements between another of the Company's subsidiaries, Zhizhen Artificial Intelligent Technology (Shanghai) Co. Ltd. ("WFOE"), a wholly foreign-owned enterprise and limited liability company, and Shanghai Xiao-i and its subsidiaries.

91.    Xiao-I's ability to transfer cash and other assets, including IPO proceeds, between itself, WFOE, and Shanghai Xiao-i is limited by applicable Chinese foreign exchange laws and regulations.

92.    One such regulation, Circular 37,[8] imposes certain registration requirements on Chinese residents that contribute domestic assets or interests to offshore companies, known SPVs, as well as on foreign investment enterprises established by way of round-tripping.  Prior to and following the IPO, certain of Xiao-I's shareholders that were Chinese residents failed to comply with Circular 37 registration.

93.    The Registration Statement purported to warn of risks that "may" occur because of certain of Xiao-I's shareholders' non-compliance with Circular 37 registration, while simultaneously failing to disclose the true scope and severity of those same risks, stating, in relevant part:

> ***Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents, and as a result, the shareholders may be subject to penalties if we are not able to remediate the non-compliance.***
>
> ***
>
> Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration.... ***The Chinese resident shareholders' failure to comply with Circular 37 registration may result in restrictions being imposed on part of foreign exchange activities of the offshore special purpose vehicles,[9] including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration***; and repatriation of profits and dividends derived from special purpose vehicles to China, by the Chinese resident shareholders who fail to complete Circular 37 registration, are also illegal. In addition, the failure of the Chinese resident shareholders to complete Circular 37 registration may subject each of the shareholders to fines less than RMB50,000. We cannot assure you that each of our Chinese resident shareholders will in the future complete the registration process as required by Circular 37.[10]

---

[8] In July 2014, the State Administration of Foreign Exchange promulgated the Circular on Issues Concerning Foreign Exchange Administration over the Overseas Investment and Financing and Roundtrip Investment by Domestic Residents via Special Purpose Vehicles ("Circular 37").

[9] Presumably, the Company is the offshore special purpose vehicle referred to therein.

[10] Emphasis added except as to first paragraph.

94.     But this risk factor was misleading *as the heading indicated* that as a result of non-compliance with Circular 37, *certain shareholders* may be subject to penalties. Additionally, the remainder of the risk warning explains that while most of the Company's shareholders are in compliance with Circular 37, there may be restrictions on Xiao-I's ability to receive registered capital as well as additional capital from *"some of our beneficial owners," who are China residents, who fail to complete Circular 37 registration*. There was no mention about the Company's potential inability to receive and use the bulk of the IPO proceeds, which would be devastating to the Company's financial prospects and share price.  Defendants' failure to disclose the true scope and severity of risks that Xiao-I faced due to certain of its Chinese shareholders' non-compliance with Circular 37 Registration violated Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, which required Xiao-I to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."

95.     On April 28, 2023, Xiao-I filed it 2022 20-F annual report reporting the Company's financial and operating results for the quarter and year ended December 31, 2022.  The 2022 20-F revealed for the first time the Company's potential inability to use the IPO proceeds for its intended purposes. With respect to risk factors, the 2022 20-F states:

> **Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents, and as a result, currently WFOE is unable to open a new capital account with banks within China, and may be restricted from remitting funds or handling other foreign exchange businesses within China unless and until we remediate the non-compliance.**[11]
>
> Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration…. **The Chinese resident shareholders'**

_____

[11] As previously stated, "WFOE" is another Xiao-I subsidiary.

> *failure to comply with Circular 37 registration may result in restrictions being imposed on part of foreign exchange activities of the offshore special purpose vehicles, including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration….* In addition, the failure of the Chinese resident shareholders to complete Circular 37 registration may subject each of the shareholders to fines less than RMB50,000…. As a result, WFOE is unable to open a new capital account with banks within China, and may be restricted from remitting funds or handling other foreign exchange businesses within China. *Currently, we are unable to use most of the IPO proceeds (for product development and company operations because we are unable to transfer the funds from Xiao-I Corporation to WFOE and then to the VIE due to WFOE's inability to open a new capital account as discussed above*.[12]

96.     But these statements were also misleading and in violation of Item 105 of Regulation S-K, particularly given that the 2022 20-F also states (emphasis added):

> In March, 2023, we completed our initial public offering and was listed on the Nasdaq Global Market under the symbol "AIXI". 5,700,000 American depositary shares (each, an "ADS", collectively, "ADSs"), each represents one-third of an ordinary shares, were issued at a price of $6.8 per share for net proceeds of approximately $35.44 million, after deducting underwriting discounts, commissions and other offering expenses of $3.32 million. *We intend to use the net proceeds from the offering for research and development, investment in technology infrastructure, marketing and branding, and other capital expenditure, and other general corporate purpose*.

97.     In the July 27, 2023 SEC Letter discussed above, the SEC took issue with these misleading statements and requested more explicit disclosures in the 2022 20-F's risk factors section concerning certain of Xiao-I's Chinese shareholders' non-compliance with Circular 37, particularly with respect to the Company's inability to use offering proceeds for its intended business purposes, stating, in relevant part (emphasis added):

> We note your disclosure [in the 2022 20-F] that the WFOE is unable to open a new capital account with banks within China, and currently, you are unable to use most of the IPO proceeds for product development and company operations because you are unable to transfer the funds from Xiao-I Corporation to the WFOE and then to [Shanghai Xiao-i]. *Previously, in your [Registration Statement], the heading for this risk factor indicated that as a result of non-compliance, the shareholders*

---

[12] Emphasis added except as to first paragraph.

*may be subject to penalties. Further, the description of the risks may imply that restrictions on foreign exchange activities and ability to receive registered capital are limited to interactions between the WFOE and the shareholders that failed to complete Circular 37 registration. Please revise this risk factor and throughout your filing to clarify the risks and potential impact to the company and the PRC operating entities as a result of PRC resident shareholders that do not comply with Circular 37 registration, including explicit discussion of the potential inability to use offering proceeds for business development and operations as intended.*

* * *

You disclose that you intend to use the net offering proceeds from your March 2023 [IPO] for research and development, investment in technology infrastructure, marketing and branding, and other capital expenditure, and other general corporate purpose. *Please revise [this disclosure] to prominently disclose that you are currently unable to use most of the IPO proceeds for the intended product development and company operations because you are unable to transfer the funds from Xiao-I Corporation to the WFOE and then to [Shanghai Xiao-i].*

98.     In response to the SEC Letter, the Company filed the Amended 2022 20-F on August 10, 2023, which disclosed that while the Company may be subject to restrictions being imposed on its foreign exchange activities resulting from the Chinese resident shareholders' failure to comply with Circular 37, and that WFOE may be unable to open new capital accounts with banks in China and may be restricted from remitting funds or handling other foreign exchange business until the non-compliance with Circular 37 is remediated, WFOE was able to open a new capital account, and apart from an undisclosed "small amount" of the IPO proceeds, transferred the rest of the IPO proceeds from overseas to WFOE for Shanghai Xiao-i's product development and operations.  The Amended 2022 20-F states in relevant part (emphasis added):

Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration…. *The Chinese resident shareholders' failure to comply with Circular 37 registration may result in restrictions being imposed on part of foreign exchange activities of the offshore special purpose vehicles, including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration*…. In addition, the failure of the Chinese resident

29

shareholders to complete Circular 37 registration may subject each of the shareholders to fines less than RMB50,000. As a result, these shareholders may be subject to penalties themselves, *and WFOE may be unable to open a new capital account with relevant banks within China according to their internal control policies and may be restricted from remitting funds or handling other foreign exchange businesses within China unless and until we remediate the non-compliance. However, WFOE has successfully opened a new capital account with Bank of Ningbo recently. Apart from a small amount of the IPO proceeds reserved for overseas use, we were able to transfer the rest of the IPO proceeds from overseas to WFOE for VIE's product development and operations through both WFOE's new capital account with Bank of Ningbo and WFOE's pre-existing capital account with Agricultural Bank of China where WFOE has reserved foreign exchange quota*. So long as there are no changes to PRC laws and regulations, or internal control policies of Bank of Ningbo, we are not aware of any substantial obstacles for WFOE to receive fund transfers from overseas in the near future. However, should there be any changes to PRC laws and regulations or internal control policies of Bank of Ningbo in the future, WFOE then may be restricted from transferring funds from overseas to its capital account with Bank of Ningbo as a result.

\*\*\*

*We intend to use the net proceeds from the offering for research and development, investment in technology infrastructure, marketing and branding, and other capital expenditure, and other general corporate purpose. Recently, WFOE has successfully opened a new capital account with Bank of Ningbo. Apart from a small amount of the IPO proceeds reserved for overseas use, we were able to transfer the rest of the IPO proceeds from overseas to WFOE for VIE's product development and operations through both WFOE's new capital account with Bank of Ningbo and WFOE's pre-existing capital account with Agricultural Bank of China*…. Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents. As a result, these shareholders may be subject to penalties themselves, and *WFOE may be unable to open a new capital account with relevant banks within China according to their internal control policies and may be restricted from remitting funds or handling other foreign exchange businesses within China unless and until we remediate the non-compliance*.

99.     The exchange between Xiao-I and the SEC regarding the Company's Circular 37 risk disclosure has cast doubt on the Company's transparency and negatively affected investor confidence, notwithstanding the news about the Company's ability to use the IPO proceeds in the

manner intended, including for research and development expenses which is crucial in the AI business.

## THE REGISTRATION STATEMENT OMITTED MATERIAL FACTS REQUIRED TO BE STATED THEREIN AND NECESSARY TO MAKE THE STATEMENTS THEREIN NOT MISLEADING

100.    The Company's Registration Statement omitted to state material facts both required by governing SEC regulations and necessary to make the statements made not misleading. Defendants are liable for those omissions and/or misleading statements either because they are strictly liable or because the statements were made negligently.

101.    The Company's Consolidated Statements of Operations and Comprehensive Income for the years ended December 31, 2020 and December 31, 2021, appeared as follows in the Registration Statement:

**XIAO-I CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE (LOSS)/INCOME**
**(In U.S. dollars, except for share and per share data, or otherwise noted)**

| | For the years ended December 31, | |
| --- | --- | --- |
| | **2020** | **2021** |
| | **Restated (Note 18)** | **Restated (Note 18)** |
| Net revenues | $   13,856,734 | $   32,524,013 |
| Cost of revenues | (7,228,046) | (10,885,731) |
| **Gross profit** | **6,628,688** | **21,638,282** |
| | | |
| Operating expenses: | | |
| Selling expenses | (4,566,760) | (4,620,113) |
| General and administrative expenses | (5,694,785) | (6,657,251) |
| Research and development expenses | (4,236,723) | (5,363,909) |
| **Total operating expenses** | **(14,498,268)** | **(16,641,273)** |
| | | |
| **(Loss)/income from operations** | **(7,869,580)** | **4,997,009** |

102.     The Registration Statement also contained the Company's Condensed Consolidated Statements of Operations and Comprehensive Income for the six months ended June 30, 2021 and June 30, 2022, which appeared as follows:

32

**XIAO-I CORPORATION**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND**
**COMPREHENSIVE (LOSS)/INCOME**
**(In U.S. dollars, except for share and per share data, or otherwise noted)**

| | For the six months ended June 30, | |
| --- | --- | --- |
| | **2021** | **2022** |
| | **(Unaudited)** | **(Unaudited)** |
| Net revenues | $  8,874,070 | $  12,859,481 |
| Cost of revenues | (3,598,319) | (3,720,705) |
| **Gross profit** | **5,275,751** | **9,138,776** |
| | | |
| Operating expenses: | | |
| Selling expenses | (2,205,736) | (2,094,124) |
| General and administrative expenses | (3,598,496) | (1,725,928) |
| Research and development expenses | (2,692,321) | (3,669,196) |
| **Total operating expenses** | **(8,496,553)** | **(7,489,248)** |
| **(Loss)/income from operations** | **(3,220,802)** | **1,649,528** |

103.    The Registration Statement was negligently prepared, and as a result, the statements referenced in ¶¶101-02 omitted to state material facts both required by governing SEC regulations and necessary to make the statements made not misleading.  Specifically, the Registration Statement made misleading statements and/or failed to disclose: (i) Xiao-I's costs of revenues by product or service revenue class; (ii) that Xiao-I's failure to sufficiently report such information pertaining to its costs of revenues was in contravention of the express requirements set out in Section 210.5-03(b)(2) of Regulation S-X; (iii) that the Company's failure to disclose such pertinent gross margin measures and metrics (that would otherwise be considered key performance indicators for a company) left investors in the dark as to which of Xiao-I's revenue segments were least/most profitable (which was the essence of the required disclosure under Section 210.5-03(b)(2) of Regulation S-X) and called into question whether management and the Board had

33

been/were being transparent about the direction of the Company; (iv) that the omission of such material facts rendered the Company's statements regarding "cost of revenues" misleading as half-truth statements; and (v) that as a result, made the Registration Statement materially misleading.

104.    The Registration Statement purported to warn of risks that "may" occur because of certain of Xiao-I's shareholders' non-compliance with Circular 37 Registration, while simultaneously failing to disclose the true scope and severity of those same risks, stating, in relevant part:

> ***Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents, and as a result, the shareholders may be subject to penalties if we are not able to remediate the non-compliance.***

***

> Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration.... ***The Chinese resident shareholders' failure to comply with Circular 37 registration may result in restrictions being imposed on part of foreign exchange activities of the offshore special purpose vehicles, including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration***; and repatriation of profits and dividends derived from special purpose vehicles to China, by the Chinese resident shareholders who fail to complete Circular 37 registration, are also illegal. In addition, the failure of the Chinese resident shareholders to complete Circular 37 registration may subject each of the shareholders to fines less than RMB50,000. We cannot assure you that each of our Chinese resident shareholders will in the future complete the registration process as required by Circular 37.[13]

105.    With further regard to these Chinese Xiao-I shareholders' non-compliance with Circular 37 Registration, the Registration Statement states (emphasis added):

> ***PRC regulations relating to offshore investment activities by PRC residents may limit our PRC subsidiary's ability to increase its registered capital or distribute profits to us or otherwise expose us to liability and penalties under PRC law.***

---

[13] Emphasis added except as to first paragraph.

34

\*\*\*

> If our shareholders who are PRC residents or entities do not complete their registration with the local SAFE branches, our PRC subsidiary may be prohibited from distributing its profits and proceeds from any reduction in capital, share transfer or liquidation to us, ***and we may be restricted in our ability to contribute additional capital to our PRC subsidiary***. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.[14]

106.    The Registration Statement was negligently prepared, and, as a result, the statements referenced in ¶¶104-05 omitted to state material facts both required by governing SEC regulations and necessary to make the statements made not misleading.  Specifically, the Registration Statement failed to disclose the true scope and severity of risks that Xiao-I faced due to certain of its Chinese shareholders' non-compliance with Circular 37 Registration, including the Company's potential inability to use IPO proceeds for its intended business purposes, which was in violation of Item 105 of SEC Regulation S-K, and misleading.

## THE TRUTH EMERGES

107.    On July 27, 2023, the SEC issued a letter to Xiao-I regarding the Company's 2022 20-F.  The SEC Letter took issue with the Company's preparation of its financial statements, and encouraged the Company to look to Section 210.5-03(b)(2) of Regulation S-X to supplement the disclosures in its statements of comprehensive income in the 2022 20-F.  With respect to revenue classes, ***the letter also asked why technology development services was not included as a separate line of business in the Registration Statement but was included separately, just a month later, in the Company's 2022 20-F filed on April 28, 2023***.

---

[14] Emphasis added except as to first paragraph.

108.    The SEC Letter also discussed the need for more explicit disclosures in the 2022 20-F's risk factors section concerning certain of Xiao-I's Chinese shareholders' non-compliance with Circular 37 Registration, particularly with respect to the Company's inability to use IPO proceeds for its intended business purposes, stating, in relevant part (emphasis added):

> We note your disclosure [in the 2022 20-F] that the WFOE is unable to open a new capital account with banks within China, and currently, you are unable to use most of the IPO proceeds for product development and company operations because you are unable to transfer the funds from Xiao-I Corporation to the WFOE and then to [Shanghai Xiao-i]. *Previously, in your [Registration Statement], the heading for this risk factor indicated that as a result of non-compliance, the shareholders may be subject to penalties. Further, the description of the risks may imply that restrictions on foreign exchange activities and ability to receive registered capital are limited to interactions between the WFOE and the shareholders that failed to complete Circular 37 registration. Please revise this risk factor and throughout your filing to clarify the risks and potential impact to the company and the PRC operating entities as a result of PRC resident shareholders that do not comply with Circular 37 registration, including explicit discussion of the potential inability to use offering proceeds for business development and operations as intended.*

> \* \* \*

> You disclose that you intend to use the net offering proceeds from [the IPO] for research and development, investment in technology infrastructure, marketing and branding, and other capital expenditure, and other general corporate purpose. *Please revise [this disclosure] to prominently disclose that you are currently unable to use most of the IPO proceeds for the intended product development and company operations because you are unable to transfer the funds from Xiao-I Corporation to the WFOE and then to [Shanghai Xiao-i].*

109.    In response, the Company filed the Amended 2022 20-F on August 10, 2023.  The Amended 2022 20-F disclosed revenues and cost of revenue as follows:

36

| | For the years ended December 31, | | |
|---|---|---|---|
| | **2020** | **2021** | **2022** |
| Sale of software products | $5,098,730 | $14,878,256 | $3,547,113 |
| Sale of hardware products | 415,723 | 75,011 | 46,295 |
| Technology development service | 6,404,394 | 9,246,992 | 16,419,889 |
| M&S service | 1,937,887 | 2,772,795 | 2,429,526 |
| Sale of cloud platform products | - | 5,550,959 | 25,742,135 |
| Net revenues (including sales to related parties of $2,449,560, $286,875 and nil for the years ended December 31, 2020, 2021 and 2022, respectively) | 13,856,734 | 32,524,013 | 48,184,958 |
| Cost of sale of software products | (2,148,758) | (771,293) | (888,220) |
| Cost of sale of hardware products | (276,261) | (29,970) | (25,141) |
| Cost of technology development service | (3,604,014) | (4,390,825) | (12,194,044) |
| Cost of M&S service | (1,199,013) | (1,862,483) | (1,255,973) |
| Cost of Sale of cloud platform products | - | (3,831,160) | (3,015,766) |
| Cost of revenues | (7,228,046) | (10,885,731) | (17,379,144) |
| **Gross profit** | **6,628,688** | **21,638,282** | **30,805,814** |

110.    The Company also filed a letter on August 10, 2023, in response to the SEC letter. The letter explained why the Company broke technology development services revenue into a separate line item its 2022 20-F, stating, in relevant part (emphasis added):

> In 2022, together with a better reputation in the AI industry, we served more customers to provide technology development services. For the year ended December 31, 2022, the revenue generated from technology development services was of $16.4 million, increased by 77% from $9.2 million in 2021. *Technology development services also represent the Company's future revenue growth source.* Therefore, we believe it is significant enough and necessary to change the presentation of the revenue breakdown to include revenue from technology development services as a separate line item, which will be more accurate for investors to understand the Company's business focus and strategy.

111.    The Amended 2022 20-F afforded newfound insight into the Company's gross margins by revenue class, information not otherwise known or discernible by investors for the periods presented. It revealed that the gross margins for the Company's technology development services line of business were significantly lower than the gross margins for its sale of software products for the periods presented – information that was not otherwise or previously known, and

which could not have been known but for the disaggregation of the products-type and service-type revenues (and costs of revenues) embedded in the single line item "sale of software products and service." For example, the gross margin for the sale of software products was 94.82% for 2021, compared to 52.52% for technology development services for the same period.

112. Investors likely viewed the Amended 2022 20-F and the Company's August 10, 2023 letter as a shift in part regarding the Company's expected primary revenue sources – from a higher margin products line of business to a lower margin services line of business, and wondered whether management and the Board had been/were being transparent about the direction of the Company.

113. The Amended 2022 20-F also clarified the risk factors with respect to Circular 37:

Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration…. *The Chinese resident shareholders' failure to comply with Circular 37 registration may result in restrictions being imposed on part of foreign exchange activities of the offshore special purpose vehicles, including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration*…. In addition, the failure of the Chinese resident shareholders to complete Circular 37 registration may subject each of the shareholders to fines less than RMB50,000. As a result, these shareholders may be subject to penalties themselves, *and WFOE may be unable to open a new capital account with relevant banks within China according to their internal control policies and may be restricted from remitting funds or handling other foreign exchange businesses within China unless and until we remediate the non-compliance. However, WFOE has successfully opened a new capital account with Bank of Ningbo recently. Apart from a small amount of the IPO proceeds reserved for overseas use, we were able to transfer the rest of the IPO proceeds from overseas to WFOE for VIE's product development and operations through both WFOE's new capital account with Bank of Ningbo and WFOE's pre-existing capital account with Agricultural Bank of China where WFOE has reserved foreign exchange quota*. So long as there are no changes to PRC laws and regulations, or internal control policies of Bank of Ningbo, we are not aware of any substantial obstacles for WFOE to receive fund transfers from overseas in the near future. However, should there be any changes to PRC laws and regulations or internal control policies of Bank of Ningbo in the future, WFOE then may be

restricted from transferring funds from overseas to its capital account with Bank of Ningbo as a result.

***

*We intend to use the net proceeds from the offering for research and development, investment in technology infrastructure, marketing and branding, and other capital expenditure, and other general corporate purpose. Recently, WFOE has successfully opened a new capital account with Bank of Ningbo. Apart from a small amount of the IPO proceeds reserved for overseas use, we were able to transfer the rest of the IPO proceeds from overseas to WFOE for VIE's product development and operations through both WFOE's new capital account with Bank of Ningbo and WFOE's pre-existing capital account with Agricultural Bank of China*…. Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents. As a result, these shareholders may be subject to penalties themselves, and *WFOE may be unable to open a new capital account with relevant banks within China according to their internal control policies and may be restricted from remitting funds or handling other foreign exchange businesses within China unless and until we remediate the non-compliance*.

114.    On this news, Xiao-I's ADS price fell $3.07 per ADS over the following two trading days, or 38%, to close at $4.97 per ADS on August 14, 2023.

115.    On September 25, 2023, during pre-market hours, Xiao-I filed a Form 6-K along with a press release announcing its unaudited and unreviewed financial results for the first half of 2023. Following the lead of the Amended 2022 20-F, revenues and cost of revenues for the first six months of 2022 and 2023 were disclosed as follows:

39

|  | For the six months ended June 30, | |
|---|---|---|
|  | **2022** | **2023** |
| Sale of software products | $ 1,397,996 | $ 535,004 |
| Sale of hardware products | 18,431 | 30,175 |
| Technology development service | 6,296,844 | 1,763,797 |
| M&S service | 1,497,871 | 1,426,784 |
| Sale of cloud platform products | 3,648,339 | 22,719,659 |
| **Net revenues** | **12,859,481** | **26,475,419** |
| Cost of sale of software products | (170,377) | (368,021) |
| Cost of sale of hardware products | (12,545) | (26,118) |
| Cost of technology development service | (2,661,707) | (1,286,290) |
| Cost of M&S service | (339,213) | (805,948) |
| Cost of sale of cloud platform products | (536,863) | (3,519,521) |
| **Cost of revenues** | **(3,720,705)** | **(6,005,898)** |
| **Gross profit** | **9,138,776** | **20,469,521** |

116.    These disclosures show that while Xiao-I reported higher revenues from services such as "technology development services" than in "sales of software products," the gross margin was significantly higher in "sales of software products."

117.    The Company's failure to disclose the information required by Section 210.5-03(b)(2) of Regulation S-X prior to amending its 2022 20-F as of and for the year ended December 31, 2022 (as well as filing its results for the six months ended June 30, 2022, and 2021, on September 25, 2023) made the financial statements included in the Registration Statement and 2022 20-F misleading to investors because it left them without required transparency, confusion about the direction of the Company with respect to its varied revenue streams, and an unduly favorable picture of the Company's business.    The gross margins for each segment of the Company's business were as follows:

40

| Sector | Full Year 2020 | Full Year 2021 | Six Months Ending June 30, 2022 |
|---|---|---|---|
| **Sale of Software Products** | 57.86% | 94.82% | 87.81% |
| **Sale of Hardware Products** | 33.55% | 60.05% | 31.94% |
| **Technology Development Services** | 43.73% | 52.52% | 57.73% |
| **M&S Service** | 38.13% | 32.83% | 77.35% |
| **Sale of Cloud Platform Products** | N/A | 30.98% | 85.28% |

118.    As reflected in the table above, the gross margin for software products was 87.81% for the six months ending June 30, 2022, compared to 57.73% for technology development services for the same period.  Given that Section 210.5-03(b)(2) of Regulation S-X required the Company to separately disclose the costs of revenues for its products and services, and there is a large disparity in the costs of revenues across Xiao-I's varied revenue streams, investors would have considered this information to be material in making investment decisions about the Company.

119.    The Company's failure to disclose material gross margin measures and metrics (that would otherwise be considered key performance indicators for a company) left investors in the dark as to which of Xiao-I's revenue segments were least/most profitable (which was the essence of the required disclosure under Section 210.5-03(b)(2) of Regulation S-X) and called into question whether management and the Board had been/were being transparent about the direction of the Company.  Additionally, the omission of such material facts rendered the Company's affirmative statements regarding "cost of revenues" misleading as half-truth statements.

120.    On this news, Xiao-I's ADS price fell $0.30 per ADS, or 14.22%, to close at $1.81 per ADS on September 25, 2023.

41

121.    As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the Company's ADSs, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS
## FOR THE SECURITIES ACT CLAIMS

122.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Securities Act Class.  Excluded from the Securities Act Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

123.    The members of the Securities Act Class are so numerous that joinder of all members is impracticable.  While the exact number of Securities Act Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Securities Act Class. Record owners and other members of the Securities Act Class may be identified from records maintained by Xiao-I or its transfer agent and may be notified of the pendency of this action by mail and email, using the form of notice similar to that customarily used in securities class actions.

124.    Plaintiff's claims are typical of the claims of the members of the Securities Act Class as all members of the Securities Act Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

125.    Plaintiff will fairly and adequately protect the interests of the members of the Securities Act Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Securities Act Class.

126. Common questions of law and fact exist as to all members of the Securities Act Class and predominate over any questions solely affecting individual members of the Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein; and

- whether the Registration Statement was negligently prepared and omitted to state material facts required by governing SEC regulations or necessary to make the statements made not misleading.

127. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by the individual Securities Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SECURITIES ACT COUNTS

### COUNT I

**(Violations of Section 11 of the Securities Act Against the Securities Act Defendants)**

128. Plaintiff incorporates the foregoing ¶¶1-2, and 4-127 by reference, except any allegation of fraud, recklessness, or intentional misconduct.

129. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Securities Act Defendants.

130. The Registration Statement for the IPO was negligently prepared and, as a result, omitted to state material facts both required by governing SEC regulations and necessary to make the statements made not misleading.

43

131. Xiao-I is the registrant for the IPO. The Securities Act Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

132. As issuer of the shares, Xiao-I is strictly liable to Plaintiff and the Class for the omissions of any material facts and materially misleading statements in the Registration Statement.

133. None of the Securities Act Defendants named herein made a reasonable investigation as to whether the Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

134. A reasonable investigation by the Securities Act Defendants would have revealed that the Registration Statement omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading.

135. By reasons of the conduct herein alleged, each Securities Act Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

136. Plaintiff acquired Xiao-I shares pursuant and/or traceable to the Registration Statement for the IPO.

137. Plaintiff and the Securities Act Class have sustained damages. The value of Xiao-I ADSs has declined substantially subsequent to the IPO and because of Defendants' violations.

## COUNT II

### (Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)

138. Plaintiff incorporates the foregoing ¶¶1-2, and 4-137 by reference, except any allegation of fraud, recklessness, or intentional misconduct.

139. This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

44

140.    The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Xiao-I within the meaning of Section 15 of the Securities Act.

141.    The Securities Act Individual Defendants were participants in the violations of Section 11 of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

142.    This count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive is expressly excluded from this count.

143.    By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Securities Act Class for damages suffered.

## EXCHANGE ACT CLAIMS

### PARTIES

144.    Plaintiff, as set forth in her previously filed Certification (ECF No. 27-3), purchased or otherwise acquired Xiao-I securities during the Exchange Act Class Period, and suffered damages as a result of the federal securities law violations.

145.    Defendant Xiao-I is incorporated in the Cayman Islands with principal executive offices located at 5/F, Building 2, No. 2570, Hechuan Road, Minhang District, Shanghai, China 201101.  The Company's ADSs trade in an efficient market on the NASDAQ under the ticker symbol "AIXI."

146.    Defendant Yuan has served as Xiao-I's Chairman of the Board and CEO at all relevant times.

147.    Defendant Weng has served as Xiao-I's Chief Financial Officer at all relevant times.

148.    Defendants Yuan and Weng are collectively referred to herein as the "Exchange Act Individual Defendants" for purposes of the Exchange Act Claims.

149.    The Exchange Act Individual Defendants possessed the power and authority to control the contents of Xiao-I's SEC filings, press releases, and other market communications. The Exchange Act Individual Defendants were provided with copies of Xiao-I's SEC filings alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Xiao-I, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and/or misleading. The Exchange Act Individual Defendants are liable for the false and/or misleading statements pleaded herein.

150.    Xiao-I and the Exchange Act Individual Defendants are collectively referred to herein as the "Exchange Act Defendants."

**MATERIALLY FALSE AND/OR MISLEADING STATEMENTS
ISSUED DURING THE EXCHANGE ACT CLASS PERIOD**

151.    The Exchange Act Class Period begins on March 9, 2023, when Xiao-I's ADSs began publicly trading on the NASDAQ pursuant to the materially misleading statements contained in the Registration Statement, as referenced in ¶¶61-63, *supra*.  The Exchange Act Individual Defendants signed or authorized the signing of the Registration Statement.

46

152.    The Company's Consolidated Statements of Operations and Comprehensive Income for the years ended December 31, 2020, and December 31, 2021, appeared as follows in the Registration Statement:

**XIAO-I CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE (LOSS)/INCOME**
**(In U.S. dollars, except for share and per share data, or otherwise noted)**

|  | For the years ended December 31, | |
| --- | --- | --- |
|  | **2020** | **2021** |
|  | **Restated (Note 18)** | **Restated (Note 18)** |
| Net revenues | $   13,856,734 | $   32,524,013 |
| Cost of revenues | (7,228,046) | (10,885,731) |
| **Gross profit** | **6,628,688** | **21,638,282** |
|  |  |  |
| Operating expenses: |  |  |
| Selling expenses | (4,566,760) | (4,620,113) |
| General and administrative expenses | (5,694,785) | (6,657,251) |
| Research and development expenses | (4,236,723) | (5,363,909) |
| **Total operating expenses** | **(14,498,268)** | **(16,641,273)** |
|  |  |  |
| **(Loss)/income from operations** | **(7,869,580)** | **4,997,009** |

153.    The Registration Statement also contained the Company's Condensed Consolidated Statements of Operations and Comprehensive Income for the six months ended June 30, 2021 and June 30, 2022, which appeared as follows:

47

**XIAO-I CORPORATION**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND**
**COMPREHENSIVE (LOSS)/INCOME**
**(In U.S. dollars, except for share and per share data, or otherwise noted)**

| | For the six months ended June 30, | |
| --- | --- | --- |
| | **2021** | **2022** |
| | **(Unaudited)** | **(Unaudited)** |
| Net revenues | $   8,874,070 | $   12,859,481 |
| Cost of revenues | (3,598,319) | (3,720,705) |
| **Gross profit** | **5,275,751** | **9,138,776** |
| | | |
| Operating expenses: | | |
| Selling expenses | (2,205,736) | (2,094,124) |
| General and administrative expenses | (3,598,496) | (1,725,928) |
| Research and development expenses | (2,692,321) | (3,669,196) |
| **Total operating expenses** | **(8,496,553)** | **(7,489,248)** |
| **(Loss)/income from operations** | **(3,220,802)** | **1,649,528** |

154.    The statements referenced in ¶¶152-53 were materially misleading because the Exchange Act Defendants made misleading statements or omitted to state facts necessary to make the statements made not misleading.  Specifically, the Registration Statement made misleading statements and/or failed to disclose: (i) Xiao-I's "costs of revenues" by product or service revenue class; (ii) that Xiao-I's failure to sufficiently report such information pertaining to its costs of revenues by product or service revenue class was in contravention of the express requirements set out in Section 210.5-03(b)(2) of Regulation S-X; (iii) that the Company's obfuscation of pertinent gross margin measures and metrics (that would otherwise be considered key performance indicators for a company) left investors in the dark as to which of Xiao-I's revenue segments were least/most profitable (which was the essence of the required disclosure under Section 210.5-03(b)(2) of Regulation S-X) and called into question whether management and the Board had been/were being transparent about the direction of the Company; (iv) that the omission of such

48

material facts rendered the Company's statements regarding "cost of revenues" misleading as half-truth statements; and (v) as a result, made the Registration Statement materially misleading.

155.    The Registration Statement purported to warn of risks that "may" occur because of certain of Xiao-I's shareholders' non-compliance with Circular 37 Registration, while simultaneously downplaying the same, stating, in relevant part:

> ***Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents, and as a result, the shareholders may be subject to penalties if we are not able to remediate the non-compliance.***

***

> Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration.... ***The Chinese resident shareholders' failure to comply with Circular 37 registration may result in restrictions being imposed on part of foreign exchange activities of the offshore special purpose vehicles,[15] including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration***; and repatriation of profits and dividends derived from special purpose vehicles to China, by the Chinese resident shareholders who fail to complete Circular 37 registration, are also illegal. In addition, the failure of the Chinese resident shareholders to complete Circular 37 registration may subject each of the shareholders to fines less than RMB50,000. We cannot assure you that each of our Chinese resident shareholders will in the future complete the registration process as required by Circular 37.[16]

156.    With further regard to these Chinese Xiao-I shareholders' non-compliance with Circular 37 Registration, the Registration Statement states:

> ***PRC regulations relating to offshore investment activities by PRC residents may limit our PRC subsidiary's ability to increase its registered capital or distribute profits to us or otherwise expose us to liability and penalties under PRC law.***

***

---

[15] Presumably, the Company is the offshore special purpose vehicle referred to therein.

[16] Emphasis added except as to first paragraph.

49

If our shareholders who are PRC residents or entities do not complete their registration with the local SAFE branches, our PRC subsidiary may be prohibited from distributing its profits and proceeds from any reduction in capital, share transfer or liquidation to us, *and we may be restricted in our ability to contribute additional capital to our PRC subsidiary*. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.[17]

157.    The statements referenced in ¶¶155-56 were materially misleading or omitted to state other material facts necessary to make the statements made not misleading.  Specifically, the Exchange Act Defendants failed to disclose the true scope and severity of risks that Xiao-I faced due to certain of its Chinese shareholders' non-compliance with Circular 37 Registration, including the Company's potential inability to use Offering proceeds for its intended business purposes, which was in violation of Item 105 of SEC Regulation S-K, and misleading.

158.    On April 28, 2023, Xiao-I filed its annual report on Form 20-F with the SEC, signed by Defendant Yuan, reporting the Company's financial and operating results for the quarter and year ended December 31, 2022.  The 2022 20-F also failed to disclose Xiao-I's costs of revenues by product or service revenue class as required by Section 210.5-03(b)(2) of Regulation S-X.. Instead, the Company disclosed revenues and cost of revenues as follows:

|  | For the years ended December 31, | | |
| --- | --- | --- | --- |
|  | **2020** | **2021** | **2022** |
| Sale of software products | $5,098,730 | $14,878,256 | $3,547,113 |
| Sale of hardware products | 415,723 | 75,011 | 46,295 |
| Technology development service | 6,404,394 | 9,246,992 | 16,419,889 |
| M&S service | 1,937,887 | 2,772,795 | 2,429,526 |
| Sale of cloud platform products | - | 5,550,959 | 25,742,135 |
| Net revenues (including sales to related parties of $2,449,560, $286,875 and nil for the years ended December 31, 2020, 2021 and 2022, respectively) | 13,856,734 | 32,524,013 | 48,184,958 |
| Cost of revenues | (7,228,046) | (10,885,731) | (17,379,144) |
| **Gross profit** | **6,628,688** | **21,638,282** | **30,805,814** |

---

[17] Emphasis added except as to first paragraph.

159.    The statements referenced in ¶158 were materially misleading because the Exchange Act Defendants made misleading statements or omitted to state facts necessary to make the statements made not misleading. Specifically, 2022 20-F made misleading statements and/or failed to disclose: (i) Xiao-I's "costs of revenues" by product or service revenue class; (ii) that Xiao-I's failure to sufficiently report such information pertaining to its costs of revenues by product or service revenue class was in contravention of the express requirements set out in Section 210.5-03(b)(2) of Regulation S-X; (iii) that the Company's obfuscation of pertinent gross margin measures and metrics (that would otherwise be considered key performance indicators for a company) left investors in the dark as to which of Xiao-I's revenue segments were least/most profitable (which was the essence of the required disclosure under Section 210.5-03(b)(2) of Regulation S-X) and called into question whether management and the Board had been/were being transparent about the direction of the Company; (iv) that the omission of such material facts rendered the Company's statements regarding "cost of revenues" misleading as a half-truth statement; and (v) as a result, made the 2022 20-F materially misleading.

160.    With respect to Circular 37 risk factors, the 2022 20-F states:

***Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents, and as a result, currently WFOE is unable to open a new capital account with banks within China, and may be restricted from remitting funds or handling other foreign exchange businesses within China unless and until we remediate the non-compliance.***

Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration…. ***The Chinese resident shareholders' failure to comply with Circular 37 registration may result in restrictions being imposed on part of foreign exchange activities of the offshore special purpose vehicles, including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration….*** In addition, the failure of the Chinese resident shareholders to complete Circular 37 registration may subject each of the

51

shareholders to fines less than RMB50,000…. As a result, WFOE is unable to open a new capital account with banks within China, and may be restricted from remitting funds or handling other foreign exchange businesses within China. *Currently, we are unable to use most of the IPO proceeds (for product development and company operations because we are unable to transfer the funds from Xiao-I Corporation to WFOE and then to the VIE due to WFOE's inability to open a new capital account as discussed above*.[18]

161.    The 2022 20-F also states (emphasis added):

In March, 2023, we completed our initial public offering and was listed on the Nasdaq Global Market under the symbol "AIXI". 5,700,000 American depositary shares (each, an "ADS", collectively, "ADSs"), each represents one-third of an ordinary shares, were issued at a price of $6.8 per share for net proceeds of approximately $35.44 million, after deducting underwriting discounts, commissions and other offering expenses of $3.32 million. *We intend to use the net proceeds from the offering for research and development, investment in technology infrastructure, marketing and branding, and other capital expenditure, and other general corporate purpose*.

162.    The statements referenced in ¶¶160-61 were materially misleading or omitted to state other material facts necessary to make the statements made not misleading.  Specifically, the statements failed to disclose the true scope and severity of risks that Xiao-I faced due to certain of its Chinese shareholders' non-compliance with Circular 37 Registration, including the Company's potential inability to use IPO proceeds for its intended business purposes, which was in violation of Item 105 of SEC Regulation S-K.

163.    Appended as exhibits to the 2022 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Exchange Act Individual Defendants certified that the 2022 20-F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all

---

[18] Emphasis added except as to first paragraph.

material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report[.]"

164.    The statements referenced in ¶163 were materially false and/or misleading because the 2022 20-F made misleading statements and/or failed to disclose: (i) the true scope and severity of risks that Xiao-I faced due to certain of its Chinese shareholders' non-compliance with Circular 37 Registration, including the Company's potential inability to use Offering proceeds for its intended business purposes, which was in violation of Item 105 of SEC Regulation S-K (ii) Xiao-I's costs of revenues by product or service revenue class; (iii) that Xiao-I's failure to sufficiently report such information pertaining to its costs of revenues by product or service revenue class was in contravention of the express requirements set out in Section 210.5-03(b)(2) of Regulation S-X; (iv) that the Company's obfuscation of pertinent gross margin measures and metrics (that would otherwise be considered key performance indicators for a company) left investors in the dark as to which of Xiao-I's revenue segments were least profitable (which was the essence of the required disclosure under Section 210.5-03(b)(2) of Regulation S-X) and called into question whether management and the Board had been/were being transparent about the direction of the Company; (v) that the omission of such material facts rendered the Company's statements regarding "costs of revenues" misleading as half-truth statements; and (vi) as a result, made the 2022 20-F materially false and/or misleading.

## SCIENTER ALLEGATIONS SOLELY FOR THE EXCHANGE ACT CLAIMS

165.    During the Exchange Act Class Period, the Exchange Act Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, the Exchange Act Defendants participated in a scheme to defraud and

53

committed acts, practices, and participated in a course of business that operated as a fraud or deceit

on purchasers of the Company's ADSs during the Exchange Act Class Period.

**A.     The Company Requires Huge Sums of Money for Research and Development and to Compete, and Was in Dire Straits and Desperate for Capital Prior to and after the IPO**

166.    The financials in the Registration Statement show that as of June 30, 2022, Xiao-I

had only $1.52 million in cash and cash equivalents, approximately $60.3 million in total

liabilities, and an accumulated deficit of $72 million. For the six months ended June 30, 2022, the

Company incurred negative cash flows from operations of $6.8 million. ***The Company concluded***

***that there was substantial doubt about its ability to continue as a going concern for a period of***

***one year from the date that these interim financial statements were issued***.

167.    The Registration Statement states that the Company planned to use the net proceeds

for research and development, among other things. Research and development is crucial for the

Company.  The Registration Statement states:[19]

> ***To support our business growth, we continue to invest heavily in our research and development efforts….***
>
> ***Our technological capabilities are critical to our success, and we have been continuously investing heavily in our research and development efforts***…. The industry in which we operate is subject to rapid technological changes and is evolving quickly in terms of technological innovation. ***We need to invest significant resources, including financial and human resources, in research and development to lead technological advances in order to make our products and solutions innovative and competitive in the market. As a result, we expect that our research and development expenses will continue to increase.***
>
> …. ***Our significant expenditures on research and development*** may not generate corresponding benefits….
>
> ***
>
> Normally, ***AI companies require a great amount of working capital for overhead expenditures . . . , including the costs for researching and developing innovative***

---

[19] Emphasis added except as to first paragraph.

*technologies… AI companies need to ensure that they are capable of receiving continuous and sufficient funding to finance their R&D activities….*

\*\*\*

**Our Research and Development**

*We believe a strong research and development capability is crucial* to our continued success and ability to develop innovative solution offerings to keep up with rapid development and advances in AI technologies.

168.    With respect to competition, the Registration Statement states (emphasis added):

The competition in the AI services industry is intense. We compete with various integrated AI services providers in chatbots and personal assistants as conversational intermediates. We also compete with new companies entering into the AI service industry. The rapid nature of new technologies emerging also enhances the competitive nature of our industry. *Among the many other Chinese competitors, our products' global competitors include Apple Siri, Microsoft Cortana and Amazon Echo.*

\*\*\*

The AI industry market is competitive and rapidly evolving. *The principal competitive factors in our market include research and development capabilities*, industry know-how, continuous capital investment, product portfolio, among others. *Some of our existing competitors might have substantial competitive advantages, including … greater … research and development … resources.*

169.    The Company's 2022 20-F, filed after the IPO, also shows Xiao-I was desperate for capital *prior to* the IPO.  The 2022 20-F states that as of December 31, 2021, and 2022, the Company had only $1.31 million and $1.03 million in cash and cash equivalents, respectively. For the years ended December 31, 2021, and 2022, the Company incurred negative cash flows from operations of $11.9 million and $10.9 million, respectively. Additionally, as of December 31, 2021, and 2022, the Company had an accumulated deficit of $72.6 million and $78.5 million, respectively.

170.    Hence, the cash crunch left the Company in desperate need of the IPO to get much needed capital for research and development to remain competitive. Indeed, the IPO proceeds were

so important to the Company that top management – CEO Yuan and CFO Weng – had to be aware of its importance to the Company's operation. Given that the Company concluded that there was substantial doubt about its ability to continue as a going concern, Yuan and Weng had different incentives from a generic corporate insider. Indeed, they knew they were at risk of losing their jobs without the IPO.

171.    As such, it stands to reason that the Exchange Act Defendants acted intentionally or recklessly: (i) in misleading investors about the potential risk due to Circular 37, including the potential inability to use IPO proceeds; and (ii) failing to disclose the costs of revenue by product or service revenue class as required by Section 210.5-03(b)(2) of Regulation S-X, which rendered the Company's affirmative statements regarding "cost of revenues" materially misleading "half-truth" statements.

172.    Indeed, later events further support these allegations.  On September 25, 2023, the Company filed a Form 6-K with the SEC with an attached press release that states that *for the six months ended June 30, 2023, research and development expenses "grew by 708% year over year"* (from $3,669,196 for the six months ended June 30, 2022, to $29,649,703) (emphasis added). The Company also reported a net loss of $18.8 million for the first half of 2023, compared to a net income of $0.6 million for the same period of 2022, and research and development expenses formed the largest portion of expenses impacting the decline in Xiao-I's operating income throughout 2023.

173.    Then, on April 30, 2024, the Company filed its year-end 2023 20-F with the SEC. Therein, the Company disclosed that there was a substantial doubt about the Company's ability to continue as a going concern (emphasis added): "As of December 31, 2022 and 2023, we had US$1.03 million and US$1.56 million in cash and cash equivalents, respectively."  "For the years

ended December 31, 2021, 2022 and 2023, we incurred negative operating flows of $11.9 million and $10.9 million and $15.8 million, respectively. As of December 31, 2023, we had an accumulated deficit of $110.8 million. *We concluded that there is substantial doubt about our ability to continue as a going concern for a period of one year from the date that these audited consolidated financial statements are issued.*" These results of operations and negative cash flows were primarily the result of massive increases in research and development expenses throughout the period, without sufficient corresponding income to offset the expenditures.

### B.    Additional Facts Supporting the Inference of Scienter

174.    The fact that the Company disclosed the revenue information for its products and services lines of business as required by Section 210.5-03(b)(1) of Regulation S-X in both the Registration Statement and 2022 20-F (signed by CEO Yuan) but failed to disclose the costs of revenues by product or service revenue class as required by (b)(2), shows that the Exchange Act Defendants considered both Sections 210.5-03(b)(1) *and* (b)(2) of Regulation S-X prior to the IPO, and intentionally or recklessly chose not to comply with Section 210.5-03(b)(2) by not including the costs of revenues by product or service revenue class in both the Registration Statement and 2022 20-F.

175.    Additionally, the fact that the Registration Statement (signed by CEO Yuan and CFO Weng) and the 2022 20-F (signed by CEO Yuan), contained misleading risk warnings due to non-compliance with China's Circular 37 means that the Exchange Act Defendants were aware of the potential problems stemming from Circular 37, including the potential inability to use the IPO proceeds. Indeed, the Exchange Act Defendants misled investors as to the true risk concerning potential problems stemming from Circular 37, and rolled the dice and hoped for the best.

**LOSS CAUSATION FOR PLAINTIFF'S EXCHANGE ACT CLAIMS**

176.    As detailed herein, during the Exchange Act Class Period, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's ADSs.  The scheme operated as a fraud or deceit on purchasers of Xiao-I's ADSs by misleading and misrepresenting the adverse facts detailed herein. When the Exchange Act Defendants' fraudulent conduct was disclosed and became apparent to the market, the price of Xiao-I's ADSs declined significantly as the prior artificial inflation came out of the price of Xiao-I's ADSs.

177.    By concealing the adverse facts detailed herein from investors, the Exchange Act Defendants presented a misleading picture of the Company's business, prospects, and operations. The Exchange Act Defendants' materially false and/or misleading statements had the intended effected and caused Xiao-I's ADSs to trade at artificially inflated levels throughout the Exchange Act Class Period, reaching as high as $10.39 per ADS on August 1, 2023. As a result of their purchases of Xiao-I ADSs at artificially inflated prices during the Exchange Act Class Period, Plaintiff and the other Exchange Act Class members suffered economic loss, i.e., damages under the federal securities laws.

178.    When the truth about the Company was revealed to the market, the price of Xiao-I ADSs dropped.  The decline removed the inflation from the price of Xiao-I ADSs, causing real economic loss to investors who had purchased Xiao-I ADSs during the Exchange Act Class Period. The decline in the price of Xiao-I ADSs, when the corrective disclosures came to light, was a direct result of the nature and extent of the Exchange Act Defendants' materially false and/or misleading statements being revealed to investors and the market.

179.    The disclosures that corrected the market price to eliminate the inflation caused by the Exchange Act Defendants' materially false and/or misleading statements are detailed below:

58

(1)    As detailed in ¶¶109-14, the Company filed its Amended 2022 20-F and response to the SEC Letter on August 10, 2023.  In response to the disclosures in these SEC filings, Xiao-I's ADS price fell $3.07 per ADS over the following two trading days, or 38%, to close at $4.97 per ADS on August 14, 2023.

(2)    As detailed in ¶¶115-20, the Company filed a Form 6-K on September 25, 2023. In response to the disclosures in this SEC filing, Xiao-I's ADS price fell $0.30 per ADS, or 14.22%, to close at $1.81 per ADS on September 25, 2023.

180.    The economic loss, i.e., damages, suffered by Plaintiff and the other Exchange Act Class members was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the price of Xiao-I's ADSs and the subsequent significant decline in the value of Xiao-I's ADSs when the prior false and/or misleading statements were revealed.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS**

181.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Exchange Act Class.  Excluded from the Exchange Act Class are Xiao-I and the Exchange Act Individual Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Company or the Exchange Act Individual Defendants have or had a controlling interest.

182.     The members of the Exchange Act Class are so numerous that joinder of all members is impracticable.  Throughout the Exchange Act Class Period, Xiao-I securities were actively traded on the NASDAQ.  While the exact number of Exchange Act Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Exchange Act Class.  Record owners and other members of the Exchange Act Class may be identified from

records maintained by Xiao-I or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

183.    Plaintiff's claims are typical of the claims of the members of the Exchange Act Class as all members of the Exchange Act Class are similarly affected by the Exchange Act Defendants' wrongful conduct in violation of federal law that is complained of herein.

184.    Plaintiff will fairly and adequately protect the interests of the members of the Exchange Act Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Exchange Act Class.

185.    Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the Exchange Act Class.  Among the questions of law and fact common to the Exchange Act Class are:

- whether the federal securities laws were violated by the Company and the Exchange Act Individual Defendants' acts as alleged herein;

- whether statements made by Exchange Act Defendants to the investing public during the Exchange Act Class Period, were false and/or misleading;

- whether the Exchange Act Defendants acted knowingly or recklessly in issuing false and/or misleading statements;

- whether the prices of Xiao-I securities during the Exchange Act Class Period were artificially inflated because of the Exchange Act Class Defendants' conduct complained of herein; and

- whether the members of the Exchange Act Class have sustained damages and, if so, what is the proper measure of damages.

186.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense

60

and burden of individual litigation make it impossible for members of the Exchange Act Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

187.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- The Exchange Act Defendants made public material misrepresentations or failed to disclose material facts during the Exchange Act Class Period;

- Xiao-I securities are traded on the NASDAQ in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Exchange Act Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Exchange Act Class purchased, acquired and/or sold Xiao-I securities between the time the Exchange Act Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

188.    Based upon the foregoing, Plaintiff and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

189.    Alternatively, Plaintiff and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the Exchange Act Defendants omitted material information in their Exchange Act Class Period statements in violation of a duty to disclose such information, as detailed above.

## SECURITIES EXCHANGE ACT COUNTS

## COUNT III

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against the Exchange Act Defendants)

190.    Plaintiff incorporates the foregoing ¶¶1, 3-30, 59-99, 107-21, and 144-89 by reference.

191.    This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

192.    During the Exchange Act Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Exchange Act Class; made various untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Exchange Act Class Period, did: (i) deceive the investing public, including Plaintiff and other Exchange Act Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Xiao-I ADSs; and (iii) cause Plaintiff and other members of the Exchange Act Class to purchase or otherwise acquire Xiao-I ADSs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

193.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of

the SEC filings, press releases and other statements and documents described above. Such statements were materially false and/or misleading in that they failed to disclose material adverse information and misrepresented the truth about Xiao-I's finances and business prospects.

194. By virtue of the Exchange Act Individual Defendants' positions at Xiao-I, the Exchange Act Defendants had actual knowledge of the materially false and/or misleading statements alleged herein and intended thereby to deceive Plaintiff and the other members of the Exchange Act Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and/or misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.

195. Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the CFO and CEO/Director of Xiao-I, the Exchange Act Individual Defendants had knowledge of the details of Xiao-I's internal affairs.

196. The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Xiao-I. As the CFO and CEO/Director of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Xiao-I's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and/or misleading public statements, the market price of Xiao-I securities was artificially inflated throughout the Exchange Act Class

63

Period.  In ignorance of the adverse facts concerning Xiao-I's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Exchange Act Class purchased or otherwise acquired Xiao-I securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

197.    During the Exchange Act Class Period, Xiao-I securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Xiao-I ADSs at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiff and the other members of the Exchange Act Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Exchange Act Class, the true value of Xiao-I ADSs was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Xiao-I ADSs declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and the Exchange Act Class members.

198.    By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

199.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Exchange Act Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's ADSs during

the Exchange Act Class Period, upon the disclosure that the Company had been disseminating false and/or misleading statements to the investing public.

## COUNT IV

### (Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)

200.    Plaintiff incorporates the foregoing ¶¶1, 3-30, 59-99, 107-21 and 144-99 by reference.

201.    During the Exchange Act Class Period, the Exchange Act Individual Defendants participated in the operation and management of Xiao-I, and conducted and participated, directly and indirectly, in the conduct of Xiao-I's business affairs.  Because of their senior positions, they knew the adverse non-public information about Xiao-I's false and/or misleading statements.

202.    As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company, and to correct promptly any public statements issued by Xiao-I which had become materially false or misleading.

203.    Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various statements which Xiao-I disseminated in the marketplace during the Exchange Act Class Period.  Throughout the Exchange Act Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Xiao-I to engage in the wrongful acts complained of herein.  The Exchange Act Individual Defendants, therefore, were "controlling persons" of Xiao-I within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Xiao-I ADSs.

65

204.     Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Xiao-I.  As senior officers and/or directors of Xiao-I, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Xiao-I to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Individual Defendants exercised control over the general operations of Xiao-I and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Exchange Act Class complain.

205.     By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Xiao-I.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative for each class;

B.     Awarding Plaintiff and other members of the two classes damages by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the two classes prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 30, 2025                              Respectfully submitted,

                                                  **POMERANTZ LLP**

                                                  */s/ Brenda Szydlo*

Jeremy A. Lieberman
Brenda Szydlo
Dean P. Ferrogari
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bszydlo@pomlaw.com
dferrogari@pomlaw.com

*Attorneys for Lead Plaintiff Qiao Shiyao and the Proposed Classes*

**HAO & HAN LAW FIRM**
Junbo Hao
12B05, Tower A
Ocean Express Building
Chaoyang District, Beijing
People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

*Additional Counsel for Lead Plaintiff Qiao Shiyao*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel*

## CERTIFICATION OF SERVICE

I, Brenda Szydlo, hereby certify that I filed a true and correct copy of the foregoing Second

Amended Class Action Complaint with the Clerk of Court using the CM/ECF system, which will

send notification of such filing to all counsel of record.

Dated: June 30, 2025

*/s/ Brenda Szydlo*
Brenda Szydlo

68