UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                  :
QIAO SHIYAO, *individually and on behalf of all others*           :
*similarly situated.*,                                             :
                                                                  :
                                                 Plaintiff,       :
                                                                  :
                          -v-                                     :
                                                                  :
XIAO-I CORPORATION, *et al.*,                                     :
                                                                  :
                                                Defendants.       :
                                                                  :
------------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/7/2026

1:24-cv-7837-GHW

MEMORANDUM OPINION &
ORDER

GREGORY H. WOODS, United States District Judge:

Xiao-I Corporation ("Xiao-I," or the "Company") is an artificial intelligence company that operates through subsidiaries in China. Xiao-I filed for an initial public offering ("IPO") in December 2022 by filing a registration statement (the "Registration Statement") with the Securities and Exchange Commission (the "SEC"). The Registration Statement reported revenues for four of the Company's lines of business. It only reported costs of revenues in the aggregate and did not break out the costs of revenues for each line of business in a way that would parallel the Company's reporting of its revenues. The Registration Statement also included a discussion of risks related to certain regulations in the People's Republic of China (the "PRC").

Shortly after completing its IPO, Xiao-I filed an annual report on Form 20-F (the "Annual Report"). The Annual Report reported revenues for five of the Company's lines of business. It also only reported costs of revenues in the aggregate. In a discussion of risks related to PRC regulations, the Annual Report disclosed that one of Xiao-I's Chinese subsidiaries had been unable to open a bank account in China, and that the Company had thus been unable to use the proceeds of the IPO for their intended purpose.

In July 2023, the SEC sent Xiao-I a letter requesting revisions to the Annual Report. The SEC asked Xiao-I to revise its discussion of risks related to PRC regulations. The SEC also asked Xiao-I to revise its financial disclosures to "state the cost of products and cost of services" and asked it to "refer to Rule 5-03(b)(2) of [SEC] Regulation S-X." The Company responded by filing a revised Annual Report. The revised Annual Report included an additional discussion of PRC regulatory risk and a breakdown of the Company's costs by line of business. In the following two trading days, the price of Xiao-I's shares fell. Six weeks later, Xiao-I reported revenues for the first six months of 2023 on Form 6-K, which included the costs of products and services by lines of business. Following that disclosure, the price of Xiao-I's shares fell further.

In the operative complaint, Lead Plaintiff Qiao Shiyao asserts that Xiao-I's statements in the Registration Statement and Annual Report were misleading because they failed to disclose both the costs of each of Xiao-I's lines of business and the true scope of the risks related to PRC regulations. She asserts violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Sections 11 and 15 of the Securities Act. Defendants—which include Xiao-I, its officers, board members, and the underwriters of the IPO—now move to dismiss.

Because both the Registration Statement and the Annual Report disclosed the risk that PRC regulations might prevent Xiao-I from using the proceeds of the IPO, Defendants' motion to dismiss the claims arising under Section 11 and Section 10(b) as they relate to those risk disclosures is GRANTED. Because Lead Plaintiff does not allege that the disclosed costs of revenue data were inaccurate, Defendants' motion to dismiss the Exchange Act claims as they relate to those disclosures is also GRANTED. However, because Lead Plaintiff has adequately pleaded that Xiao-I violated Regulation S-X by failing to separately state the cost of services in the Registration Statement, Defendants' motion to dismiss the claims arising under Section 11 of the Securities Act as they relate to the disclosure of cost of revenues data in the Registration Statement is DENIED.

I.    **BACKGROUND**

A.    **Factual Background[1]**

Xiao-I is a global artificial intelligence company, incorporated in the Cayman Islands and headquartered in China.  SAC ¶ 4.  It is a holding company with no operations of its own.  *Id.*  It conducts most of its operations through its Chinese subsidiaries.  *Id.*  Two of those subsidiaries are relevant to this motion:  Shanghai Xiao-i, a variable interest entity (the "VIE") and Zhizhen Artificial Intelligent Technology (Shanghai) Co. Ltd., a wholly foreign-owned enterprise and limited liability company (the "WFOE").  *Id.* ¶ 90.

The VIE "comprises the Company's AI business."  SAC ¶ 4.  "According to Xiao-I, '[the VIE] has become a leading [AI] company by building on its wide technology commercialization, brand recognition and culture of innovation in China.'"  *Id.* ¶ 5.

"Xiao-I has the full and exclusive right to manage and direct all cash flow and assets of [the VIE] and to direct and administrate its financial affairs and daily operation.  This is accomplished via a series of contractual arrangements between" the WFOE "and [the VIE] and its subsidiaries."  SAC ¶ 90.

i.    **The Registration Statement[2]**

On December 20, 2022, Xiao-I filed with the SEC the Registration Statement on Form F-1.  SAC ¶ 6.  The Registration Statement was declared effective on March 8, 2023.  *Id.*  On March 13, 2023, Xiao-I filed a prospectus on Form 424B4 in connection with the IPO, which "incorporated and formed part of the Registration Statement."  *Id.* ¶ 8.

---

[1] The facts are taken from the second amended complaint, Dkt. No. 77 ("SAC") and the documents that Lead Plaintiff relied on in the complaint and are accepted as true for the purposes of this motion.  *See, e.g., Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] A complete copy of the Registration Statement is available on the SEC's EDGAR database at https://www.sec.gov/Archives/edgar/data/1935172/000121390022081122/ff12022_xiaoicorp.htm.  Dkt. No. 90 ("Lomuscio Decl.") ¶ 3 n.2.  As appropriate, the Registration Statement will be cited according to the pagination on EDGAR.

The Registration Statement included a discussion of the Company's business as well as historical data about the Company's financial performance.  The Registration Statement identified four lines of the Company's business:  (1) the "sale of software products and service"; (2) the "sale of cloud platform products;" (3) "M&S service;" and (4) the "sale of hardware products."  *Id.* ¶ 66. The Registration Statement described "software products and service" as consisting of "software products sold to customers comprising customized software products for specific needs."  *Id.*  The Registration Statement described "cloud platform products" as consisting of "standardized software products uploaded to the [Company's] cloud platform."  *Id.*  The Registration Statement described "M&S service" as services "for software products contracts and consist[ing] of unspecified future software updates, upgrades, and enhancements as well as technical product support services, and the provision of unspecified updates and upgrades."  *Id.*  Finally, the Registration Statement described "hardware products" as consisting of "[h]ardware products sold to customers comprising the hardware designed for specific needs."  *Id.*

The Registration Statement contained the Company's financial statements.  Among these were the "Company's consolidated financial statements for the years end[ing] December 31, 2020 and 2021, as well as for the six months end[ing] June 30, 2021 and June 30, 2022."  *Id.* ¶ 64.  As a part of its "Consolidated Statements of Operations and Comprehensive Income," the Registration Statement reported net revenues and cost of revenues in tabular format as follows for the years ending December 31, 2020 and December 31, 2021:

**XIAO-I CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE (LOSS)/INCOME**
**(In U.S. dollars, except for share and per share data, or otherwise noted)**

| | For the years ended December 31, | |
| --- | --- | --- |
| | 2020 | 2021 |
| | Restated (Note 18) | Restated (Note 18) |
| Net revenues | $ 13,856,734 | $ 32,524,013 |
| Cost of revenues | (7,228,046) | (10,885,731) |
| **Gross profit** | **6,628,688** | **21,638,282** |
| | | |
| Operating expenses: | | |
| Selling expenses | (4,566,760) | (4,620,113) |
| General and administrative expenses | (5,694,785) | (6,657,251) |
| Research and development expenses | (4,236,723) | (5,363,909) |
| **Total operating expenses** | **(14,498,268)** | **(16,641,273)** |
| | | |
| **(Loss)/income from operations** | **(7,869,580)** | **4,997,009** |

*Id.* ¶ 101.  The Registration Statement made similar disclosures for the six month periods ending

June 30, 2021 and June 30, 2022:

**XIAO-I CORPORATION**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND**
**COMPREHENSIVE (LOSS)/INCOME**
**(In U.S. dollars, except for share and per share data, or otherwise noted)**

| | For the six months ended June 30, | |
| --- | --- | --- |
| | 2021 | 2022 |
| | (Unaudited) | (Unaudited) |
| Net revenues | $ 8,874,070 | $ 12,859,481 |
| Cost of revenues | (3,598,319) | (3,720,705) |
| **Gross profit** | **5,275,751** | **9,138,776** |
| | | |
| Operating expenses: | | |
| Selling expenses | (2,205,736) | (2,094,124) |
| General and administrative expenses | (3,598,496) | (1,725,928) |
| Research and development expenses | (2,692,321) | (3,669,196) |
| **Total operating expenses** | **(8,496,553)** | **(7,489,248)** |
| **(Loss)/income from operations** | **(3,220,802)** | **1,649,528** |

*Id.* ¶ 102 (together with paragraph 101, the "Registration Statement Aggregated Costs

Statements").  The highlighted numbers in both tables presented the aggregate costs of revenue for

the relevant period.  Lead Plaintiff identifies the highlighted numbers as the purportedly misleading

statements, because they did not break out the costs of the Company's revenues by line of business.

*See id.* ¶¶ 101–03.  The Company did not report "costs of revenues" or "net revenues" for each of

the Company's four lines of business on the face of its "Consolidated Statements of Operations and Comprehensive Income." *See id.* ¶¶ 101–03. She does not allege that the highlighted numbers were otherwise inaccurate.

The Company reported revenue broken out for each line of the Company's business elsewhere in the Registration Statement. *Id.* ¶ 76 n.5; *see also* Registration Statement at 97.

| | For the Years Ended December 31, | | Change | | For the Six Months Ended June 30, | | Change | |
|---|---|---|---|---|---|---|---|---|
| | 2020 | 2021 | Amount | % | 2021 | 2022 | Amount | % |
| | | | | | (Unaudited) | (Unaudited) | | |
| Sale of software products and service | $ 11,500,331 | $ 24,140,541 | $ 12,640,210 | 109.9% | $ 4,875,236 | $ 7,694,840 | $ 2,819,604 | 57.8% |
| Sale of cloud platform products | — | 5,532,917 | 5,532,917 | >100% | 2,525,007 | 3,648,339 | 1,123,332 | 44.5% |
| M&S service | 1,940,187 | 2,775,472 | 835,285 | 43.1% | 1,431,805 | 1,497,871 | 66,066 | 4.6% |
| Sale of hardware products | 416,216 | 75,083 | (341,133) | (82.0)% | 42,022 | 18,431 | (23,591) | (56.1)% |
| Total | $ 13,856,734 | $ 32,524,013 | $ 18,667,279 | 134.7% | $ 8,874,070 | $ 12,859,481 | $ 3,985,411 | 44.9% |

The Registration Statement included a discussion of the results of operations that provided information not detailed in the financial statements excerpted above. In particular, under the caption "Gross Profit and Gross Profit Margins," the Registration Statement described the Company's gross profit and gross profit margin as follows:

> Gross profit represents our revenue less cost of sales. Our gross profit margin represents our gross profit as a percentage of our revenue. *We have different types of products and services that have different profit margins.* For the years ended [sic] December 31, 2020 and 2021, our gross profit was US$6.63 million and US$21.64 million, respectively, and our gross profit margins were 47.8% and 66.5%, respectively.

Registration Statement at 101 (emphasis added). Thus, although the tables did not break out cost of revenues by line of the Company's business, the Company alerted investors to the fact that its costs of revenues differed for each line of business.

The Registration Statement also included a discussion of the risks to the Company's business. Among these were risks related to doing business in China. "Under Xiao-I and its subsidiaries' organizational structure, the Company transfers cash and other assets between itself and

6

Shanghai Xiao-i through various intermediaries." SAC ¶ 12. As a result, the Registration Statement

stated, its shareholders must comply with "applicable foreign exchange rules promulgated by China's

State Administration of Foreign Exchange ('SAFE') . . . ." *Id.* Those rules included the "Circular on

Issues Concerning Foreign Exchange Administration over the Overseas Investment and Financing

and Roundtrip Investment by Domestic Residents via Special Purpose Vehicles. ('Circular 37')." *Id.*

"Circular 37 imposes certain registration requirements on Chinese residents that contribute domestic

assets or interests to offshore companies, known special purpose vehicles . . . , as well as on foreign

investment enterprises established by way of round-tripping." *Id.*

The Company was aware that, at the time the Registration Statement became effective,

"some of its shareholders were not in compliance with Circular 37, which subjected the company to

various risks . . . ." *Id.* ¶ 13.

The Registration Statement included several statements related to the risks flowing from its

shareholders' noncompliance with Circular 37. Two form the basis of Lead Plaintiff's claims. The

first reads as follows:

> ***Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents, and as a result, the shareholders may be subject to penalties if we are not able to remediate the non-compliance.***
>
> . . .
>
> Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration . . . . ***The Chinese resident shareholders' failure to comply with Circular 37 registration may result in restrictions being imposed on part of foreign exchange activities of the offshore special purpose vehicles, including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration;*** and repatriation of profits and dividends derived from special purpose vehicles to China, by the Chinese resident shareholders who fail to complete Circular 37 registration, are also illegal. In addition, the failure of the Chinese resident shareholders to complete Circular 37 registration may subject each of the shareholders to fines less than RMB50,000. We cannot assure you that each of our Chinese resident shareholders will in the future complete the registration process as required by Circular 37.

7

SAC ¶ 104 (emphasis in second paragraph added in the complaint).

The second reads as follows:

> **PRC regulations relating to offshore investment activities by PRC residents may limit our PRC subsidiary's ability to increase its registered capital or distribute profits to us or otherwise expose us to liability and penalties under PRC law.**
>
> . . .
>
> If our shareholders who are PRC residents or entities do not complete their registration with the local SAFE branches, our PRC subsidiary may be prohibited from distributing its profits and proceeds from any reduction in capital, share transfer or liquidation to us, **and we may be restricted in our ability to contribute additional capital to our PRC subsidiary**. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

*Id.* ¶ 105 (emphasis in second paragraph added in the complaint) (together with the prior statement, the "Registration Statement Circular 37 Statements").

Defendant Hui Yuan, who served as Xiao-I's Chairman of the Board of Directors and Chief Executive Officer, signed the Registration Statement or authorized the signing of the Registration Statement. *Id.* ¶ 34. The same is true of Defendant Wei Weng, Xiao-I's Chief Financial Officer, and Defendant Wenjing Chen, a Director on Xiao-I's Board of Directors. *Id.* ¶¶ 35–36. Defendants Xiaomei Wu, Jun Xu, Zhong Lin, and H. David Sherman (together with Defendants Yuan, Weng, and Chen, the "Securities Act Individual Defendants") "signed or authorized the signing of a written consent, filed with the Registration Statement pursuant to SEC Rule 438, to be named as [] Director-nominee[s]" of Xiao-I. *Id.* ¶¶ 37–40.

Several companies were involved in the underwriting of the IPO (collectively, the "Underwriter Defendants," and along with the Securities Act Individual Defendants and Xiao-I, the "Securities Act Defendants"). Defendant Prime Number Capital LLC ("Prime") is an investment banking firm "specializing in initial public offerings . . . ." *Id.* ¶ 43. Prime was an underwriter of the IPO. *Id.* Defendant AC Sunshine Securities LLC ("Sunshine") provides investment banking

services and also "specializes in initial public offerings." *Id.* ¶ 44. Sunshine "acted as co-managing underwriter in connection with the IPO" and "assisted in the drafting and dissemination of the Registration Statement." *Id.* Defendant Guotai Junan Securities (Hong Kong) Limited ("Guotai") is a brokerage company. *Id.* ¶ 45. Guotai "acted as joint underwriter in connection with the IPO" and also "assisted in the drafting and dissemination of the Registration Statement." *Id.* Defendant SBI China Capital Financial Services Limited ("SBI") is a financial services company and acted as a co-managing underwriter in connection with the IPO. *Id.* ¶ 46. SBI also "assisted in the drafting and dissemination of the Registration Statement." *Id.*

The Underwriter Defendants "served as the underwriters of the IPO" and "shared in over $2.7 million dollars in fees collectively." *Id.* ¶ 50. They also "obtained an agreement from Xiao-I that Xiao-I would indemnify and hold [them] harmless from liability under the federal securities laws." *Id.* ¶ 51. Representatives of the Underwriter Defendants "assisted Xiao-I in planning the IPO" and undertook a due diligence investigation of Xiao-I's business and operations. *Id.* ¶ 51. As a part of this investigation, the Underwriter Defendants "had access to internal, confidential, current corporate information concerning Xiao-I's most up-to-date operational and financial results and prospects." *Id.* ¶ 52. The Underwriter Defendants "reached understandings" with Xiao-I's executives as to several aspects of the IPO, including:

> (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Xiao-I's ADSs would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Xiao-I's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

*Id.* ¶ 53.

On March 9, 2023, Xiao-I completed its IPO, issuing 5.7 million of its American depository shares ("ADSs") at an offering price of $6.80 per share. *Id.* ¶ 7. After "applicable underwriting discounts and commissions, and before expenses," the Company received $36 million from the IPO.

*Id.* Lead Plaintiff Qiao Shiyao "purchased or otherwise acquired Xiao-I ADSs pursuant and/or traceable to the Registration Statement issued in connection with the IPO . . . ." *Id.* ¶ 32.

### ii.    The Annual Report

On April 28, 2023, Xiao-I filed the Annual Report. SAC ¶ 9.[3] The Annual Report included a discussion of the Company's business and historical data about the Company's financial performance. The Company divided the "sale of software products and services" line of business identified in the Registration Statement into two lines of business: "sale of software products" and "sale of technology development services." *Id.* ¶ 80. The latter category "comprise[d] customized technology development services for specific needs of customers." *Id.* The other three categories remained unchanged. *See id.* Therefore, the Annual Report presented five lines of business, rather than the four detailed in the Registration Statement. *See id.*

In the Annual Report, the Company reported revenues across the five lines of the Company's business both in the aggregate and for each line of business. The Company only reported costs of revenues in the aggregate. *Id.* ¶ 158. The tabular report of the Company's financial performance appeared as follows:

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2020 | 2021 | 2022 |
| Sale of software products | $5,098,730 | $14,878,256 | $3,547,113 |
| Sale of hardware products | 415,723 | 75,011 | 46,295 |
| Technology development service | 6,404,394 | 9,246,992 | 16,419,889 |
| M&S service | 1,937,887 | 2,772,795 | 2,429,526 |
| Sale of cloud platform products | - | 5,550,959 | 25,742,135 |
| Net revenues (including sales to related parties of $2,449,560, $286,875 and nil for the years ended December 31, 2020, 2021 and 2022, respectively) | 13,856,734 | 32,524,013 | 48,184,958 |
| Cost of revenues | (7,228,046) | (10,885,731) | (17,379,144) |
| Gross profit | 6,628,688 | 21,638,282 | 30,805,814 |

*Id.* (together with the Registration Statement Cost of Revenues Statements, the "Aggregated Costs

---

[3] A complete copy of the Annual Report is available on the SEC's EDGAR database at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001935172/000121390023033683/f20f2022_xiaoicorp.htm. Lomuscio Decl. ¶ 4 n.5. As appropriate, the Annual Report will be cited according to the pagination on EDGAR.

Statements"). Here, again, Lead Plaintiff identifies the highlighted numbers as the purportedly misleading statements, because they did not disaggregate the Company's costs of revenues by line of business. *See id.* ¶ 159. She does not allege that the highlighted numbers were otherwise inaccurate.

The Annual Report, like the Registration Statement, included a discussion of the results of the Company's operations. And again, under the caption "Gross Profit and Gross Profit Margins," the Annual Report described the Company's gross profit and gross profit margin as follows:

> *We have different types of products and services that have different profit margins.* For the years ended [sic] December 31, 2021 and 2022, our gross profit was US$21.64 million and US$30.81 million, respectively, and our gross profit margins were 66.5% and 63.9%, respectively.

Annual Report at 76 (emphasis added).

In the Annual Report, the Company discussed its intended use of the proceeds of the IPO as follows:

> In March, 2023, we completed our initial public offering and was [sic] listed on the Nasdaq Global Market under the symbol "AIXI". 5,700,000 American depositary shares (each, an "ADS", collectively, "ADSs"), each represents one-third of an ordinary shares, were issued at a price of $6.8 per share for net proceeds of approximately $35.44 million, after deducting underwriting discounts, commissions and other offering expenses of $3.32 million. **We intend to use the net proceeds from the offering for research and development, investment in technology infrastructure, marketing and branding, and other capital expenditure, and other general corporate purpose** [sic]*.*

*Id.* ¶ 161 (emphasis in original).

At the time the Annual Report was filed, Xiao-I reported that the WFOE was unable to open a Chinese bank account, and that as a result the Company was unable to use its IPO proceeds. The Annual Report also included a discussion of the risks to the Company's business related to doing business in China. The Company discussed the risk of Circular 37 noncompliance in light of the recent development in the following way:

> **Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents, and as a result, currently WFOE is unable to open a new capital account with banks within**

11

> **China, and may be restricted from remitting funds or handling other foreign exchange businesses within China unless and until we remediate the non-compliance.**
>
> . . .
>
> Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration. . . . **The Chinese resident shareholders' failure to comply with Circular 37 registration may result in restrictions being imposed on part of foreign exchange activities of the offshore special purpose vehicles, including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration.** . . . In addition, the failure of the Chinese resident shareholders to complete Circular 37 registration may subject each of the shareholders to fines less than RMB50,000 . . . . As a result, WFOE is unable to open a new capital account with banks within China, and may be restricted from remitting funds or handling other foreign exchange businesses within China. **Currently, we are unable to use most of the IPO proceeds (for product development and company operations because we are unable to transfer the funds from Xiao-I Corporation to WFOE and then to the VIE due to WFOE's inability to open a new capital account as discussed above.**

*Id.* ¶ 160 (emphasis in second paragraph added in second amended complaint) (with the prior statement, the "Annual Report Circular 37 Statements;" and with the prior statement and the Registration Statement Circular 37 Statements, the "Circular 37 Statements").

The Annual Report contained "signed certifications pursuant to the Sarbanes-Oxley Act of 2002." SAC ¶ 163. Defendants Yuan and Weng (collectively, the "Exchange Act Individual Defendants") certified the following:

> [Based on my knowledge, this report] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]
>
> . . .
>
> [Based on my knowledge,] the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report[.]

*Id.*; *see also* Dkt. No. 90-2 at 24–25 (the "SOX Certifications").

### iii.        The SEC Letter

On July 27, 2023, the SEC issued a letter to Xiao-I regarding the Company's Annual Report. SAC ¶ 107; *see also* Dkt. No. 90-3 ("SEC Response").  The SEC commented on the presentation of financial metrics in the Annual Report and the Registration Statement and also the discussion of the risks related to Circular 37 in the Annual Report.  With respect to the financial statements in the Annual Report, the SEC "asked why technology development services was not included as a separate line of business in the Registration Statement but was included separately . . . in the" Annual Report.  SAC ¶ 107.

The SEC also requested that Xiao-I revise the Annual Reports' "Consolidated Statements of Operations and Comprehensive (Loss)/Income:"

> Please revise to state separately the cost of products sold and cost of services for the periods presented.  Refer to Rule 5-03(b)(2) of Regulation S-X.

SEC Response at 3.

The SEC also requested that Xiao-I revise the Annual Report's discussion related to Circular 37 risks.  SAC ¶ 108.  The SEC commented as follows:

> We note your disclosure [in the Annual Report] that the WFOE is unable to open a new capital account with banks within China, and currently, you are unable to use most of the IPO proceeds for product development and company operations because you are unable to transfer the funds from Xiao-I Corporation to the WFOE and then to [Shanghai Xiao-i].  Previously, in your [Registration Statement], the heading for this risk factor indicated that as a result of non-compliance, the shareholders may be subject to penalties.  Further, the description of the risks may imply that restrictions on foreign exchange activities and ability to receive registered capital are limited to interactions between the WFOE and the shareholders that failed to complete Circular 37 registration.  Please revise this risk factor and throughout your filing to clarify the risks and potential impact to the company and the PRC operating entities as a result of PRC resident shareholders that do not comply with Circular 37 registration, including explicit discussion of the potential inability to use offering proceeds for business development and operations as intended.
>
> . . .
>
> You disclose that you intend to use the net offering proceeds from [the IPO] for research and development, investment in technology infrastructure, marketing and

branding, and other capital expenditure, and other general corporate purpose.  Please revise [this disclosure] to prominently disclose that you are currently unable to use most of the IPO proceeds for the intended product development and company operations because you are unable to transfer the funds from Xiao-I Corporation to the WFOE and then to [Shanghai Xiao-i].

*Id.* ¶ 108 (emphasis removed).

### iv.        Xiao-I's Later Disclosures

In response to the SEC's letter, Xiao-I filed an amended Annual Report on August 10, 2023 (the "Amended Annual Report").  SAC ¶ 109.[4]  The Company also filed a letter responding to the SEC's correspondence.  *See* SEC Response.  In the Amended Annual Report, the Company reported revenues and costs broken down across its five lines of business and in the aggregate.  SAC ¶ 109.  The disclosure appeared in tabular format as follows:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2021 | 2022 |
| Sale of software products | $5,098,730 | $14,878,256 | $3,547,113 |
| Sale of hardware products | 415,723 | 75,011 | 46,295 |
| Technology development service | 6,404,394 | 9,246,992 | 16,419,889 |
| M&S service | 1,937,887 | 2,772,795 | 2,429,526 |
| Sale of cloud platform products | - | 5,550,959 | 25,742,135 |
| Net revenues (including sales to related parties of $2,449,560, $286,875 and nil for the years ended December 31, 2020, 2021 and 2022, respectively) | 13,856,734 | 32,524,013 | 48,184,958 |
| Cost of sale of software products | (2,148,758) | (771,293) | (888,220) |
| Cost of sale of hardware products | (276,261) | (29,970) | (25,141) |
| Cost of technology development service | (3,604,014) | (4,390,825) | (12,194,044) |
| Cost of M&S service | (1,199,013) | (1,862,483) | (1,255,973) |
| Cost of Sale of cloud platform products | - | (3,831,160) | (3,015,766) |
| Cost of revenues | (7,228,046) | (10,885,731) | (17,379,144) |
| **Gross profit** | **6,628,688** | **21,638,282** | **30,805,814** |

*Id.*

With this information showing revenues and costs for each line of business, it became possible for investors to calculate the costs of sales as a percentage of net sales, known as "gross margin," for each line of business.  *Id.* ¶ 10.  Gross margin "provides unfiltered insight into whether

---

[4] A complete copy of the Amended Annual Report is available on the SEC's EDGAR database at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001935172/000121390023065338/f20f2022a1_xiaoicorp.htm. Lomuscio Decl. ¶ 6 n.4.  As appropriate, the Amended Annual Report will be cited according to the pagination on EDGAR.

14

an entity has the ability to make money from the very thing it purports to be in business to do—produce goods or provide services." *Id.* Gross margin is an especially important metric to evaluate "Emerging Growth Companies" like Xiao-I because it provides insight into whether their "business endeavor itself . . . is indeed profitable and may be expected to be in the long run." *Id.*

Gross margin varied across the Company's lines of business and also across the periods for which Xiao-I reported financial results. *Id.* ¶¶ 117–18. For instance, "the gross margin for software products was 87.81% for the six months ending June 30, 2022, compared to 57.73% for technology development services for the same period." *Id.* ¶ 118.

The Company also explained why "technology development services" was broken into a separate line of business in the Annual Report. *Id.* ¶ 110. The Company explained that decision as follows:

> In 2022, together with a better reputation in the AI industry, we served more customers to provide technology development services. For the year ended December 31, 2022, the revenue generated from technology development services was of $16.4 million, increased by 77% from $9.2 million in 2021. **Technology development services also represent the Company's future revenue growth source.** Therefore, we believe it is significant enough and necessary to change the presentation of the revenue breakdown to include revenue from technology development services a separate line item, which will be more accurate for investors to understand the Company's business focus and strategy.

*Id.* (emphasis in complaint).

The Amended Annual Report also updated its discussion of "the risk factors with respect to Circular 37." *Id.* ¶ 113. By the time of the filing of the Amended Annual Report, the WFOE had been able to open a bank account in China, and the Company had transferred the majority of the IPO proceeds to the WFOE to fund the VIE's product development and operations. *Id.* Thus, the Amended Annual Report reported:

> Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration. . . . The Chinese resident shareholders' failure to comply with Circular 37 registration may result in restrictions being imposed on

15

part of foreign exchange activities of the offshore special purpose vehicles, including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration. . . . In addition, the failure of the Chinese resident shareholders to complete Circular 37 registration may subject each of the shareholders to fines less than RMB50,000. As a result, these shareholders may be subject to penalties themselves, and WFOE may be unable to open a new capital account with relevant banks within China according to their internal control policies and may be restricted from remitting funds or handling other foreign exchange businesses within China unless and until we remediate the non-compliance. However, WFOE has successfully opened a new capital account with Bank of Ningbo recently. Apart from a small amount of the IPO proceeds reserved for overseas use, we were able to transfer the rest of the IPO proceeds from overseas to WFOE for VIE's product development and operations through both WFOE's new capital account with Bank of Ningbo and WFOE's pre-existing capital account with Agricultural Bank of China where WFOE has reserved foreign exchange quota. So long as there are no changes to PRC laws and regulations, or internal control policies of Bank of Ningbo, we are not aware of any substantial obstacles for WFOE to receive fund transfers from overseas in the near future. However, should there be any changes to PRC laws and regulations or internal control policies of Bank of Ningbo in the future, WFOE then may be restricted from transferring funds from overseas to its capital account with Bank of Ningbo as a result.

*Id.* ¶ 113 (emphasis removed).

The Amended Annual Report also updated the disclosures regarding the use of proceeds. It stated in relevant part:

We intend to use the net proceeds from the offering for research and development, investment in technology infrastructure, marketing and branding, and other capital expenditure, and other general corporate purpose. Recently, WFOE has successfully opened a new capital account with Bank of Ningbo. Apart from a small amount of the IPO proceeds reserved for overseas use, we were able to transfer the rest of the IPO proceeds from overseas to WFOE for VIE's product development and operations through both WFOE's new capital account with Bank of Ningbo and WFOE's pre-existing capital account with Agricultural Bank of China. . . . Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents. As a result, these shareholders may be subject to penalties themselves, and WFOE may be unable to open a new capital account with relevant banks within China according to their internal control policies and may be restricted from remitting funds or handling other foreign exchange businesses within China unless and until we remediate the non-compliance.

*Id.* (emphasis removed).

Over the two trading days following the issuance of the Amended Annual Report on August 10, 2023, the ADS price fell by $3.07, or about 38%, to close at $4.97 on August 14, 2023. *Id.* ¶ 114.

16

On September 25, 2023, Xiao-I filed a Form 6-K with "unaudited and unreviewed financial results for the first half of 2023." *Id.* ¶ 115; *see also* Dkt. No. 90-5 ("Form 6-K").  Just as in the Amended Annual Report, the Form 6-K reported revenue and costs of revenue in the aggregate and for each of the five lines of business identified in the Annual Report.  SAC ¶ 115.  Consistent with the results reported in the Amended Annual Report, while Xiao-I "reported higher revenues from services such as 'technology development services' than in 'sales of software products,' the gross margin was significantly higher in 'sales of software products.'"  *Id.* ¶ 116.

On September 25, 2023, Xiao-I's ADS price "fell $0.30 per ADS, or 14.22%, to close at $1.81 per ADS" on September 25, 2023.  *Id.* ¶ 120.

## B.    Procedural History

On October 15, 2024, Yunfan Fan filed this action as a putative class action.  Dkt. No. 1.  Fan asserted four causes of action:  (1) a count alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against all Exchange Act Defendants, *id.* ¶¶ 96–105; (2) a count alleging violations of Section 20(a) of the Exchange Act against the Exchange Act Individual Defendants, *id.* ¶¶ 106–11; a count alleging violations of Section 11 of the Securities Act of 1933 (the "Securities Act") against all Securities Act Defendants, *id.* ¶¶ 112–20; and (4) a count alleging violations of Section 15 of the Securities Act against the Securities Act Individual Defendants, *id.* ¶¶ 121–25.

On December 16, 2024, Qiao Shiyao moved to be appointed as lead plaintiff and moved to approve her counsel as lead counsel.  Dkt. No. 24.  No party opposed that request.  The Court granted that request on January 9, 2025 and appointed Qiao Shiyao as Lead Plaintiff and her law firm, Pomerantz LLP, as lead counsel.  Dkt. No. 30.

On June 9, 2025, the Exchange Act Defendants and the Securities Act Defendants moved to dismiss the complaint.  Dkt. No. 67.  That motion was denied as moot when Lead Plaintiff filed her

17

second amended complaint. *See generally* SAC. The second amended complaint included the same four causes of action. *Id.* ¶¶ 128–204.

On September 2, 2025, all Defendants moved to dismiss Lead Plaintiff's complaint. *See* Dkt. No. 89 ("Mem."). Defendants argued that Lead Plaintiff's Section 11 claims sounded in fraud and were therefore subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Id.* at 13–15. Defendants argued that the second amended complaint does not meet that standard. *Id.* at 15–16. Defendants also argued that, in the alternative, the Section 11 claim must be dismissed because it only included "conclusory" allegations as to the negligence of the Underwriter Defendants and "boilerplate" allegations regarding the conduct of Xiao-I and the Securities Act Individual Defendants. *Id.* at 16–18.

Defendants argued that the Section 11 and Section 10(b) claims should be dismissed because Lead Plaintiff also failed to plead any actionable misrepresentation or omission. *Id.* at 18–26. In particular, Defendants argued that Lead Plaintiff had not alleged that the Registration Statement's financial disclosures omitted information that was required to be disclosed under Rule 5-03 of SEC Regulation S-X, 17 C.F.R. § 210.5-03. *Id.* at 18–21. They also argued that Plaintiff could not state a Section 10(b) claim premised upon their disclosure of accurate historical data. *Id.*

Next, they argued that both the Registration Statement and the Annual Report disclosed the risk that Xiao-I might not be able to use the proceeds of the IPO for their intended purposes as a result of its shareholders' noncompliance with Circular 37. *Id.* at 21–24. They also argued that the Circular 37 Statements were protected by the Private Securities Litigation Reform Act's safe harbor for forward-looking statements. *Id.* at 24–26. Defendants also argued that the omission of more granular cost data was not misleading because the disclosed data was accurate. *Id.* at 26–27. They argued that the Circular 37 Statements did not omit material information because the risk never materialized. *Id.* at 27–28.

18

As it related to Lead Plaintiff's Exchange Act claims, Defendants also argued that Lead Plaintiff had failed to plead with particularity facts giving rise to a strong inference that the Exchange Act Defendants acted with scienter. *Id.* at 28–31. Defendants also argued that Lead Plaintiff's claims did not establish that she actually relied on any of the purported omissions in purchasing shares of Xiao-I. *Id.* at 32. Next, Defendants argued that Lead Plaintiff had not pleaded sufficient facts to establish that her loss had been caused by any alleged omissions because, they argued, Lead Plaintiff had failed to plead that either the Amended Annual Report or the Form 6-K were corrective disclosures. *Id.* at 33–35. Finally, Lead Plaintiff argued that the Section 15 and Section 20(a) claims should be dismissed because there was no primary violation under the Securities Act or the Exchange Act, respectively. *Id.* at 35.

On October 7, 2025, Lead Plaintiff filed her opposition. Dkt. No. 91 ("Opp'n"). She first argued that because she had disclaimed allegations related to fraud with respect to the Section 11 claims and separated the allegations supporting fraud from the allegations supporting negligence, Rule 8 applied to her Securities Act claims. *Id.* at 14–17. She also argued that her complaint met Rule 8's pleading requirements as to the Securities Act Individual Defendants because the only pleading requirement was that there be actionable omissions in the offering documents. *Id.* at 17–18. As it related to the Underwriter Defendants, she argued that her allegations against the Underwriter Defendants gave them fair notice of the claims against them. *Id.* at 18–19.

Lead Plaintiff responded to each of Defendant's arguments related to the actionability of the statements. As it related to the Aggregated Costs Statements, Lead Plaintiff argued that these statements were "omissions in contravention of an affirmative legal disclosure pursuant to Section 210.50-03(b)(2) of Regulation S-X" because the Registration Statement did not "disclose Xiao-I's costs of revenues by product or service revenue class." *Id.* at 19–21. Lead Plaintiff also argued that even if the reported numbers were accurate, the Aggregated Costs Statements were misleading

19

because they omitted information to put the Aggregated Costs figures "in context" because the data would show that there were differences in gross margin across Xiao-I's lines of business. *Id.* (citing *In re Sturm, Ruger & Co. Sec. Litig.*, 2011 WL 494753, at *6–7 (D. Conn. Feb. 7, 2011)). In particular, she argued that the failure to disclose costs for each of the Company's lines of business rendered the Aggregated Costs Statements misleading to investors because "it left them without required transparency, confusion about the direction of the Company with respect to its varied revenue streams, and an unduly favorable picture of the Company's business." *Id.* at 33.

As it related to the Circular 37 Statements, Lead Plaintiff argued that the statements in both the Registration Statement and the Annual Report "failed to disclose" the risks of Xiao-I shareholders' noncompliance Circular 37, including the "Company's potential inability to use IPO proceeds for its intended purpose" because the statements focused on the risk of restrictions to shareholders. *Id.* at 22–24. Lead Plaintiff argued that neither the PSLRA's Safe Harbor nor the bespeaks caution doctrine protected the Circular 37 Statements because they were "materially misleading" and because the Circular 37 statements were not forward-looking. *Id.* at 25–26. Finally, Lead Plaintiff argued that Defendants had waived any challenge to the SOX Certifications because they had not addressed them.

As it related to the arguments specific to the Exchange Act claims, Lead Plaintiff argued that she was entitled to the fraud-on-the-market presumption of reliance because she had adequately pleaded that the challenged statements were half-truths. *Id.* at 27–28. She also argued that the second amended complaint adequately pleaded scienter because it alleged that Xiao-I and its officers had the motive and opportunity to commit fraud. *Id.* at 27–30. In particular, she alleged that Xiao-I was in dire need of capital, on the verge of failing, and that as a result Defendants Yuan and Weng had "different incentives from" generic corporate insiders, because they were "at risk of losing their jobs." *Id.* at 30. She argued that loss causation had been adequately pleaded because she had alleged

20

that the price of the ADSs fell when the truth about the Company emerged—*i.e.*, when the Amended Annual Report and the Form 6-K were issued. *Id.* at 31–34. Responding to Defendants' argument that the Circular 37 disclosure in the Amended Annual Report was a positive development, she argued that the "exchange between Xiao-I and the SEC . . . clarified [the Circular 37] risks, cast doubt on the Company's transparency, and negatively affected investor confidence" notwithstanding the positive development. *Id.* at 33. Finally, she argued that because she had adequately pleaded facts to support her claims under Section 11 of the Securities Act and Section 10(b) of the Exchange Act, her Section 15 and Section 20(a) claims should not be dismissed. *Id.* at 34–35.

The motion to dismiss was fully briefed when Defendants filed their reply on October 28, 2026. Dkt. No. 92 ("Reply"). They first argued that the Section 11 claims were subject to the Rule 9(b) pleading standard despite the disclaimers of fraud and the separation of the allegations of fraud and negligence because the "substance" of Lead Plaintiff's Section 11 and Section 10(b) claims were identical. *Id.* at 3–5. Next, they reprised their arguments that the second amended complaint did not state a claim against the Underwriter Defendants because it asserted no more than legal conclusions. *Id.* at 6. Addressing Lead Plaintiff's argument that Regulation S-X created an affirmative legal obligation, Defendants argued that Lead Plaintiff had not identified "how the omission of granular cost breakdowns" was in violation of Regulation S-X. *Id.* at 6–7. They also argued that Lead Plaintiff had not established why any omissions were material or misleading when the disclosed financial information was accurate. *Id.* at 6–8. Defendants once again argued that Lead Plaintiff had not stated a claim based on the Circular 37 Statements because the risk that Xiao-I might not be able to use the proceeds of the IPO had been disclosed in both the Registration Statement and the Annual Report. *Id.* at 9–11.

Defendants reprised their arguments that Lead Plaintiff had not adequately pleaded reliance,

scienter, or loss causation. Reply at 11–15. As to reliance, Defendant argued that Lead Plaintiff had not pleaded that any alleged misstatements "actually influenced her investment decision." *Id.* at 12. As to scienter, Defendants once again argued that Lead Plaintiff had failed to plead that Defendants Yuan and Weng had incentives different from a generic corporate insider. *Id.* at 12–14. Finally, Defendants argued that because the alleged corrective disclosures did not "reveal fraud," Lead Plaintiff had not adequately pleaded loss causation. *Id.* at 15.

Addressing Lead Plaintiff's waiver argument, Defendants argued that because the relevant filings did not contain materially misleading misstatements or omissions, the SOX Certifications were necessarily not actionable. *Id.* at 14–15. They also argued that the SOX Certifications were nonactionable statements of opinion. *Id.* Finally, Defendants also reprised their argument that the Section 20(a) and Section 15 claims failed without a predicate underlying claim. *Id.*

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809–10 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All. LLC v. City of N.Y Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Novak*, 216 F.3d at 306). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive under that

23

heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). Furthermore, on a motion to dismiss, the Court can consider statements made in a company's public filings with the SEC. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). As is relevant here, the Court will consider the statements made in the Registration Statement, the Annual Report, the Amended Annual Report, and the Form 6-K filings, as well as the SEC Response.

## B.    Securities Act Section 11

"Section[] 11 . . . of the Securities Act impose[s] liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions. Section 11 applies to registration statements . . . ." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)). "Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *Id.* at 358–59 (quoting 15 U.S.C. § 77k(a)). "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in

24

the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Id.* (quoting 15 U.S.C. § 77k(a)). "So long as a plaintiff establishes one of the three bases for liability under [this] provision[]—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading, . . . then, in a Section 11 case, 'the general rule [is] that an issuer's liability . . . is absolute." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011) (internal citations omitted).

### C.      Exchange Act Section 10(b) and Rule 10b-5

Under Section 10(b) of the Securities Exchange Act and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b). To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

## III.   DISCUSSION

### A.      Applicable Pleading Standard

Lead Plaintiff's claims under the Securities Act are not subject to the heightened pleading standards of Rule 9(b). "Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain

participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions.  Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications." *In re Morgan Stanley*, 592 F.3d at 358 (citing 15 U.S.C. §§ 77k(a), 77l(a)(2)).  "Section 15, in turn, creates liability for individuals or entities that 'control[] any person liable' under section 11 or 12." *Id.* (citing 15 U.S.C. § 77o).  "Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12." *Id.*

"Collectively, the language of sections 11 and 12(a)(2) creates three potential bases for liability based on registration statements and prospectuses filed with the SEC:  (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *Id.* at 360 (citing 15 U.S.C. §§ 77k (a), 77l(a)(2)).

"Fraud is not an element or a requisite to a [Securities Act] claim" and "a plaintiff need allege no more than negligence to proceed under" Section 11. *Rombach*, 355 F.3d at 171.  Nevertheless, the heightened pleading standard applies to claims brought under the Securities Act if they sound in fraud. *Id.* ("We hold that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud.").  "*Rombach* necessarily requires a case-by-case analysis of particular pleadings to determine whether 'the gravamen of the complaint is plainly fraud.'" *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (quoting *Rombach*, 355 F.3d at 172).

"In assessing the applicable pleading standard, *Rombach* instructs district courts to look not only to whether allegations are 'styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action' but also to 'the conduct alleged.'" *Pappas v. Qutoutiao Inc.*, No. 23-1233, 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024) (quoting *Rombach*, 355 F.3d at

26

171).  "A plaintiff cannot avoid the strictures of Rule 9(b) by the mere expedient[] disclaiming that its claims sound in fraud."  *Id.*  "[A] Section 11 or Section 12(a)(2) claim joined with a Section 10(b) claim is subject to Rule 9(b) where the plaintiff makes only 'nominal efforts' to plead a negligence-based claim and makes 'no effort . . . to show any other basis for the claims levied at the Prospectus' other than that the defendant acted with scienter."  *Id.* (quoting *Rombach*, 355 F.3d at 171 (internal quotations omitted)).  "A plaintiff may retain the application of the Rule 8 notice pleading standard by expressly pleading negligence, disclaiming fraud, eschewing language in its Section 11 or Section 12(a)(2) claims implying fraud or the elements thereof, and separating allegations supporting fraud claims from allegations supporting negligence claims."  *Id.*

Here, the complaint is pleaded in a manner such that Rule 8 applies to Lead Plaintiff's Section 11 claim.  The second amended complaint contains numerous blanket disclaimers of fraud with respect to the Securities Act claims.  *See, e.g.*, SAC ¶ 128 ("Lead Plaintiff incorporates the foregoing ¶¶1–2, and 4–127 by reference, except any allegation of fraud, recklessness, or intentional misconduct "); *id.* ¶ 138 (similar).

Lead Plaintiff also expressly pleads that Defendants violated the Securities Act due to their negligence.  For instance, Lead Plaintiff alleges that the "Registration Statement was *negligently prepared* and, as a result, omitted to state material facts both required to be stated therein and necessary to make the statements therein not misleading."  SAC ¶ 54 (emphasis added); *see also id.* ¶ 103 ("The Registration Statement was *negligently* prepared" (emphasis added)); *id.* ¶¶ 106, 130 (same).  Lead Plaintiff also alleges facts related to the preparation of the Registration Statement, including that the Underwriter Defendants "purportedly conducted a . . . 'due diligence' investigation" during which they "had access to internal, confidential, current corporate information

27

concerning Xiao-I's most up-to-date operational and financial results and prospects." *Id.* ¶ 52.[5]  In furtherance of her allegation that the "Registration Statement was *negligently* prepared," *id.* ¶ 54 (emphasis added), Lead Plaintiff pleaded that the Underwriter Defendants did not "ma[ke] a reasonable investigation as to whether the Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading," *id.* ¶ 55, and that such a "reasonable investigation" "would have revealed that the Registration Statement omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading," *id.* ¶ 56.  Therefore, Lead Plaintiff's complaint does more than insert "a simple disclaimer of fraud." *In re Axis Capital Holdings Ltd. Secs. Litig.*, 456 F.Supp.2d 576, 598 (S.D.N.Y. 2006).

Finally, the second amended complaint "separat[es] allegations supporting fraud claims from allegations supporting negligence claims." *Pappas*, 2024 WL 4588491, at *2.  The complaint is "structured so as to draw a clear distinction between negligence and fraud claims." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007).  The allegations related to the Securities Act claims reside in a separate section of the complaint, and each Securities Act claim is pleaded independently. *Compare* SAC at 31–44 (allegations applicable only to Securities Act claims), *with id.* at 45–65 (allegations applicable only to Exchange Act claims).  Therefore, the Court need not parse the second amended complaint to understand the basis for the Securities Act claims because the allegations sounding in fraud are not, as Defendants argue, "inextricably interwoven throughout the complaint."  Reply at 3.

---

[5] Defendants repeatedly point to the allegations in paragraph 53—which is in the portion of the complaint concerning the Securities Act—in support of their argument that the Rule 9(b) standard applies to Plaintiff's Securities Act claims. *See* Mem. at 14, 15 n. 8; *see also* Reply at 3.  However, this allegation sandwiched between allegations about the Underwriter Defendants' role in the development of the Registration Statement. *See, e.g.*, SAC ¶¶ 52, 54–55.  The Court therefore understands it to be an allegation concerning the sufficiency of the investigation undertaken by those Defendants. *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 675 (S.D.N.Y. 2004) (discussing the duty of an underwriter to "'not merely . . . listen[] to management's explanations of the company's affairs.'" (quoting *Feit v. Leasco Data Processing Equipment Corp.*, 332 F. Supp. 544, 581–82 (E.D.N.Y. 1971) (Weinstein, J.))).

In sum, Lead Plaintiff's Securities Act claims sound in negligence, not in fraud. She "made more than nominal efforts to distinguish the negligence-based claims from the fraud-based claims," her complaint "expressly disclaims fraud, scienter, and the intent of Defendants to defraud investors and painstakingly segregates the fraud and negligence claims." *Pappas*, 2024 WL 4588491, at *2. "Each claim is set forth under its own heading and incorporates only certain factual allegations such that, although all claims follow a general recitation of the factual background, the Securities Act claims expressly do not incorporate the allegations supposedly supporting a finding of scienter and reliance." *Id.*

### B.    Actionable Statements

#### i.        Legal Standard

"Under Rule 10b–5(b), it is unlawful to (1) 'make any untrue statement of a material fact,' or (2) 'omit to state a material fact necessary in order to make the statements made . . . not misleading.'" *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 138 (2d Cir. 2025) (quoting 17 C.F.R. § 240.10b–5(b)). "These prongs correspond to two actionable theories under Section 10(b) and Rule 10b–5: (1) a false statement, *i.e.*, 'an actual statement . . . that is . . . "untrue" outright,' and (2) a half-truth, *i.e.*, a 'representation[ ] that state[s] the truth only so far as it goes, while omitting critical qualifying information.'" *Id.* (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016)). As is relevant here, Lead Plaintiff do not allege that any of the statements were actually false, but rather that they were half-truths. *See generally* SAC.

In contrast with the "intuitive" case of a false statement, "[a] half-truth theory involves more nuance." *Gimpel*, 156 F.4th at 138. "A classic contract-law example of a half-truth is 'the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property.'" *Id.* at 138–39 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188–89 (2016)). "In other words, the difference between a pure

29

omission and a half-truth is the difference between a child not telling his parents he ate a whole cake and telling them he had dessert." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024).

"For securities-fraud claims, although '§ 10(b) and Rule 10b–5 do not create an affirmative duty to disclose any and all material information,' once 'a company speaks on an issue or topic,' it must 'tell the whole truth.'" *Gimpel*, 156 F.4th at 139 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), then *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)) (internal citations omitted). "That is, when a company does speak, it assumes 'a duty to be both accurate and complete,' and adequate disclosure is required to make other statements, 'in light of the circumstances under which they were made, not misleading.'" *Id.* (quoting *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002), then *Meyer*, 761 F.3d at 250) (internal citations omitted). "'Disclosure is required under [Section 10(b) and Rule 10b-5(b)] only when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading."'" *Macquarie Infrastructure Corp.*, 601 U.S. at 264 (quoting *Matrixx Initiatives, Inc.*, 563 U.S. at 44 (quoting Rule 10b-5(b))).

"A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (citation omitted). "To determine whether a statement is misleading, [a court's] inquiry is objective, from the perspective of a 'reasonable investor,' considering not only a statement's 'literal truth' but also its 'context and manner of presentation.'" *Gimpel*, 156 F.4th at 139 (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019)). Thus, "the proper inquiry requires an examination of 'defendants' representations, taken together and in context.'" *In re Morgan Stanley*, 592 F.3d at 366 (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)). However, plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed

30

information to plausibly allege fraud." *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.)*, 988 F.3d 157, 171 (2d Cir. 2021).

"Section 11(a) prohibits any registration statement that 'contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Macquarie Infrastructure Corp.*, 601 U.S. at 264 (quoting 15 U.S.C. § 77k(a)). Thus, in contrast with Section 10(b), "in addition to proscribing lies and half-truths, this section also creates liability for failure to speak on a subject at all." *Id.* "'The relevant SEC regulations answer the question as to what material facts are required to be stated in an issuer's registration statement and prospectus.'" *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 311 (S.D.N.Y. 2001), *aff'd*, 318 F.3d 170 (2d Cir. 2003) (quoting *In re N2K, Inc. Sec. Litig.*, 82 F.Supp.2d 204, 207 (S.D.N.Y.), *aff'd*, 202 F.3d 81 (2d Cir. 2000)).

To incur liability under either Section 11 or Section 10(b), misstatements or omissions must be material. "In judging whether an alleged omission was material in light of the information already disclosed to investors, [courts] consider whether there is 'a *substantial* likelihood that the disclosure of the [omitted material] would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information [already] made available.'" *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (quoting *DeMaria*, 318 F.3d at 180) (emphasis in *ProShares*); *see also In re Morgan Stanley*, 592 F.3d at 360 (definition of materiality is the same under Sections 11 as it is under Section 10(b) of the Exchange Act). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Caiola*, 295 F.3d at 329 (internal quotation marks and citation omitted). "Therefore, the Second Circuit has held, 'the materiality hurdle remains a meaningful pleading obstacle, and we will dismiss a section 11 claim where the alleged omission was 'so obviously unimportant to a reasonable investor' that reasonable minds would agree on that

31

omission's unimportance.'" *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 597 (S.D.N.Y. 2022) (quoting *In re ProShares*, 728 F.3d at 102), *aff'd sub nom. Tseng v. De Vries*, No. 22-2787-CV, 2023 WL 8073087 (2d Cir. Nov. 21, 2023).

### ii.    Application

#### 1.    Registration Statement Circular 37 Statements

Lead Plaintiff has not adequately pleaded that the Registration Statement omitted information that they were obligated to disclose under either Section 11 or Section 10(b) with respect to the Circular 37 Statements. As is relevant to Lead Plaintiff's Section 11 claims, the Registration Statement did not violate the affirmative disclosure obligation under SEC Regulation S-K. Under Item 105 of Regulation S-K, 17 C.F.R. § 229.105, a registrant must "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." *Id.* § 229.105(a). "To state a claim under Item 105, an issuer must know, at the time of the IPO, about an undisclosed risk factor that could seriously affect its present or future business." *Wandel v. Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022); *see also Jaroslawicz v. M&T Bank Corp.,* 962 F.3d 701, 713 (3d Cir. 2020) ("[T]he text of Item 105 . . . naturally requires an allegation that a known risk factor existed at the time of the offering."), *cert. denied*, 141 S. Ct. 1284 (2021). Lead Plaintiff asserts that the Registration Statement did not comply with Item 105 because it "failed to disclose the true scope and severity of" the risks associated with Circular 37 noncompliance of Xiao-I's PRC shareholders. SAC ¶ 106. The only risk factor that Lead Plaintiff pleads was not disclosed was the risk of "the Company's potential inability to use the IPO proceeds for its intended business purposes . . . ." *Id.*

This claim is not viable, however, because that risk was disclosed in the Registration Statement, which must be considered in its entirety, rather than in snippets. The Registration Statement disclosed the risk that Xiao-I might not be able to use the funds from the IPO for their

32

intended business purposes as a result of Circular 37 noncompliance by certain Xiao-I shareholders. Under the caption "Risk Factors," the Registration Statement described the risk as it related to Circular 37 noncompliance by PRC shareholders. The second statement quoted in the second amended complaint was located under the subcaption "Risks Related to Doing Business in China." Registration Statement at 58; *see also* SAC ¶ 105. That statement disclosed the risk that shareholders' noncompliance with the requirements of Circular 37 "may . . . restrict[]" Xiao-I's "ability to contribute additional capital to [its] PRC subsidiary." The statement as excerpted in the complaint reads in full:

> **PRC regulations relating to offshore investment activities by PRC residents may limit our PRC subsidiary's ability to increase its registered capital or distribute profits to us or otherwise expose us to liability and penalties under PRC law.**
>
> . . .
>
> If *our* shareholders who are PRC residents or entities do not complete their registration with the local SAFE branches, *our PRC subsidiary* may be prohibited from distributing its profits and proceeds from any reduction in capital, share transfer or liquidation to us, *and we may be restricted in our ability to contribute additional capital to our PRC subsidiary.*

SAC ¶ 105 (emphasis added); *see also* Registration Statement at 67–68.

This statement disclosed the risk that Circular 37 noncompliance could limit the ability of Xiao-I to use its IPO funds for their intended purpose. "We" and "our" referred to Xiao-I. *See* Registration Statement at 64 ("In the following discussion of risks relating to doing business in China 'we,' 'us,' or 'our' refer to Xiao-I"). In the portion of this risk factor omitted from Lead Plaintiff's complaint, the disclosure clarifies that the reference to "registration with the local SAFE branches" is a requirement PRC shareholders must meet to comply with Circular 37. *See* Registration Statement at 67 ("Circular 37 requires PRC residents or entities to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing."). "PRC subsidiary" referred to the WFOE.

33

*See* Registration Statement at 66 ("Our current PRC subsidiary is wholly owned by Xiao-i Technology"); *id.* at 6 (describing corporate structure of Xiao-I and Xiao-i Technology's ownership of the WFOE). Thus, that statement disclosed the risk that Xiao-I might not be able to contribute funding to the WFOE if PRC shareholders did not comply with the requirements under Circular 37.

The Registration Statement provided additional context that clarified that the effect of restrictions on "contributing additional capital to [Xiao-I]'s subsidiary" would be restrictions on Xiao-I's ability to use the IPO proceeds for their intended purposes. "In evaluating a prospectus, we read it as a whole." *DeMaria*, 318 F.3d at 180 (internal quotation omitted). In the section entitled "Liquidity and Capital Resources," the Registration Statement described the process by which funds from the IPO would be transferred to the VIE:

> [I]n the future, *cash proceeds from overseas financing activities, including this offering,* may be transferred by Xiao-I to its wholly-owned subsidiary AI Plus Holding Limited ("AI Plus"), and then transferred to AI Plus's wholly-owned subsidiary Xiao-I Technology Limited ("Xiao-I Technology"), and then transferred to WFOE via capital contribution or shareholder loans, as the case may be. *Cash proceeds may flow to [the VIE] from WFOE* pursuant to certain contractual arrangements between WFOE and [the VIE] as permitted by the applicable PRC regulations.

Registration Statement at 103 (emphasis added). The VIE "comprise[s] the Company's AI business." SAC ¶ 4. Therefore, the Registration Statement disclosed there was a risk that the noncompliance of certain Xiao-I shareholders with Circular 37 could result in the Company's inability to use the proceeds from the IPO as intended. Accordingly, Lead Plaintiff fails to state a Section 11 claim based on purported violations Item 105 of Regulation S-K..

For similar reasons, the two Registration Statement Circular 37 Statements are not actionable under Section 10(b) or Rule 10b-5. Lead Plaintiff asserts that these statements were misleading by omission because they "failed to disclose the true scope and severity of the risks that Xiao-I faced due to certain of its Chinese shareholders' non-compliance with Circular 37 Registration, including the Company's potential inability to use Offering proceeds for its intended business purposes . . . ."

SAC ¶ 157.  As with her allegations in support of her Section 11 claims, Lead Plaintiff does not

plead facts concerning any other risk other than the potential inability to use the IPO proceeds for

the intended purposes.  As discussed above, a reasonable investor reading the statements would not

be misled about the potential risks of Chinese shareholders' noncompliance with Circular 37.  SAC

¶ 156.  Read in context, the second statement expressly disclosed the risk that—due to that

noncompliance—there was a possibility that Xiao-I would not be able to use the proceeds of the

IPO as intended.  *See In re Morgan Stanley*, 592 F.3d at 366.

Because the second statement disclosed the risk that Lead Plaintiff alleges was not disclosed,

Lead Plaintiff cannot rest her Section 10(b) claim on her first statement.  The "proper inquiry" to

determine if a statement is a misleading half-truth requires examining defendants' representations

"taken together and in context."  *Id.*  Lead Plaintiff argues that the first statement only warned that

there was a risk that the noncompliant shareholders—rather than Xiao-I—"may be subject to

penalties" if Xiao-I was unable to remedy their noncompliance.  SAC ¶ 155.[6]  The statement further

warns that these potential penalties "include[d] restrictions in its ability to receive registered capital

as well as additional capital from Chinese resident shareholders."  *Id.*  "Its" referred to "offshore

---

[6] As pleaded, the challenged statement reads in full:

> ***Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents, and as a result, the shareholders may be subject to penalties if we are not able to remediate the non-compliance.***
> . . .
> Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration . . . . ***The Chinese resident shareholders' failure to comply with Circular 37 registration may result in restrictions being imposed on part of foreign exchange activities of the offshore special purpose vehicles, including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration***; and repatriation of profits and dividends derived from special purpose vehicles to China, by the Chinese resident shareholders who fail to complete Circular 37 registration, are also illegal.  In addition, the failure of the Chinese resident shareholders to complete Circular 37 registration may subject each of the shareholders to fines less than RMB50,000.  We cannot assure you that each of our Chinese resident shareholders will in the future complete the registration process as required by Circular 37.

SAC ¶ 155 (emphasis in original).

special purpose vehicles," which in turn is a reference to Xiao-I.  SAC ¶ 155 n.15.  A plausible reading of this statement is that it is discussing the risk that the Company may not be able to receive capital from the noncompliant shareholders, rather than the risk that the VIE would not be able to receive registered capital from Xiao-I.  *See* SAC ¶ 155.  However, even crediting Lead Plaintiff's reading of this statement, Lead Plaintiff "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 171.  A reasonable investor would understand that in addition to the risks of penalties being imposed on shareholders, there was also a risk that the WFOE would not be able to receive registered capital—and as a consequence the VIE would not be able to use the IPO proceeds for Xiao-I's intended business purposes.  Accordingly, none of the Circular 37 Statements in the Registration Statement are actionable under Section 11 or Section 10(b).

### 2.    Annual Report Circular 37 Statements

The Circular 37 statements in the Annual Report are not actionable under Section 10(b) and Rule 10b-5.  Neither of the Circular 37 Statements in the Annual Report would have misled a reasonable investor when considered in the full context in which they were made.  SAC ¶¶ 160–61. Once again, Lead Plaintiff only alleges that the disclosures in the Annual Report "failed to disclose the true scope and severity of risks . . . including the Company's potential inability to use IPO proceeds . . . ."  *Id.* ¶ 162.  The text of the first statement is fatal to Lead Plaintiff's contention that the Company did not disclose the risk of its inability to use the proceeds from its IPO.[7]  A portion

---

[7] The statement as pleaded is as follows:

> ***Some of our shareholders are not in compliance with the PRC's regulations relating to offshore investment activities by PRC residents, and as a result, currently WFOE is unable to open a new capital account with banks within China, and may be restricted from remitting funds or handling other foreign exchange businesses within China unless and until we remediate the non-compliance***

36

of the first statement discloses that "[c]urrently, *we* are unable to use most of the IPO proceeds . . .

because *we* are unable to transfer the funds from Xiao-I Corporation to WFOE and then to the VIE

due to WFOE's inability to open a" bank account in China.  *Id.* ¶ 160; *see also* Annual Report at 28.

The statement identifies the failure of Chinese shareholders to comply with Circular 37 as the reason

the subsidiary could not open a Chinese bank account.  *Id.*  In context, it is clear that "we" refers to

Xiao-I.  *See* Annual Report at 23 ("In the following discussion of risks relating to our corporate

structure, 'we,' 'us,' or 'our' refer to Xiao-I").  Thus, the statement, in plain terms, stated that *the

Company* was presently unable to use the IPO proceeds.

For this reason, the other portions of the statement identified in Paragraph 160 and the

statement identified in Paragraph 161 are not misleading half-truths.  A reasonable investor would

not receive the false impression that Xiao-I could use proceeds from the IPO.  Lead Plaintiff first

points to the fact that the caption of the risk factor excerpted at Paragraph 160 refers to WFOE's

inability to open a new capital account, rather than any restrictions on the Company.  Opp'n at 23.

However, as discussed, the body of that risk factor described the consequences of the restrictions on

WFOE:  "due to WFOE's inability to open a new capital account," "we"—*i.e.*, Xiao-I—"are unable

to use most of the IPO proceeds."  SAC ¶ 160.  And as with the Court's analysis of the first

challenged Circular 37 Statement in the Registration Statement, the discussion of "restrictions . . . on

---

Currently, most of our shareholders have completed Circular 37 Registration and are in compliance. Some of our beneficial owners, who are PRC residents, have not completed the Circular 37 Registration . . . . **The Chinese resident shareholders' failure to comply with Circular 37 registration may result in restrictions being imposed on part of foreign exchange activities of the offshore special purpose vehicles, including restrictions on its ability to receive registered capital as well as additional capital from Chinese resident shareholders who fail to complete Circular 37 registration . . . .** In addition, the failure of the Chinese resident shareholders to complete Circular 37 registration may subject each of the shareholders to fines less than RMB50,000 . . . . As a result, WFOE is unable to open a new capital account with banks within China, and may be restricted from remitting funds or handling other foreign exchange businesses within China. **Currently, we are unable to use most of the IPO proceeds []for product development and company operations because we are unable to transfer the funds from Xiao-I Corporation to WFOE and then to the VIE due to WFOE's inability to open a new capital account as discussed above.**

SAC ¶ 160 (emphasis in original).

part of foreign exchange activities . . . , including restrictions on [the offshore special purpose vehicle's] ability to receive additional capital as well as additional capital from Chinese resident shareholders" was not misleading in context.  *See* SAC ¶¶ 160, 155.

Given that the first challenged Circular 37 statement in the Annual Report explicitly disclosed that Xiao-I was presently unable to use the proceeds in the IPO, the statement excerpted in Paragraph 161 was not misleading.  *See* SAC ¶ 161.[8]  Lead Plaintiff alleges that this statement—which summarized the results of the IPO and the intended use of the net proceeds—was misleading because it omitted the fact that Xiao-I could not use the funds for their intended purpose.  SAC ¶¶ 161–62.  But, reading that statement "in context," no reasonable investor would be left with the misimpression that Xiao-I could currently use the proceeds from the IPO.  *In re Morgan Stanley*, 592 F.3d at 366.  This statement was part of the Annual Report.  As discussed, that filing stated explicitly that Xiao-I could not currently use the proceeds from the IPO.  *See* SAC ¶ 160.  Accordingly, neither of the Annual Report Circular 37 Statements were actionable under Section 10(b) and Rule 10b-5.[9]

---

[8] The statement as pleaded is as follows:

> In March, 2023, we completed our initial public offering and was listed on the Nasdaq Global Market under the symbol "AIXI". 5,700,000 American depositary shares (each, an "ADS", collectively, "ADSs"), each represents one-third of an ordinary shares, were issued at a price of $6.8 per share for net proceeds of approximately $35.44 million, after deducting underwriting discounts, commissions and other offering expenses of $3.32 million. **We intend to use the net proceeds from the offering for research and development, investment in technology infrastructure, marketing and branding, and other capital expenditure, and other general corporate purpose.**

SAC ¶ 161.

[9] The SEC's comments in its July 27, 2023 bolster the conclusion that a reasonable investor would understand from statements in the Annual Report that Xiao-I was unable to use the proceeds from the IPO.  The relevant portion of the letter begins with an acknowledgement that Xiao-I disclosed that fact:

> We note your disclosure [in the 2022 20-F] that the WFOE is unable to open a new capital account with banks within China, and currently, you are unable to use most of the IPO proceeds for product development and company operations because you are unable to transfer the funds from Xiao-I Corporation to the WFOE and then to [Shanghai Xiao-i].

SAC ¶ 97 (alterations in original).  The SEC read the document and understood it to disclose that the company was "unable to use most of the IPO proceeds . . . ."  Far from suggesting a deficiency in the disclosures, the SEC's letter shows that the SEC understood from the disclosures the risk Lead Plaintiff claims not to have been disclosed.

### 3.    Aggregated Cost Statements

### a.    Section 11 Claim

Lead Plaintiff has adequately pleaded that the Registration Statement omitted to state a material fact required to be stated therein.  In particular, Lead Plaintiff has adequately pleaded that the Registration Statement did not include the information required by Rule 5-03(b)(2) of Regulation S-X.  "In interpreting an administrative regulation, as in interpreting a statute, we must begin by examining the language of the provision at issue."  *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002). Regulation S-X applies to "[r]egistration statements under the Securities Act of 1933 . . . ."  *Id.* § 210.1-01.  A registration statement must include "audited statements of comprehensive income." *Id.* § 210.3-02.  The "purpose of [Rule 5-03] is to indicate the various line items which, if applicable . . . should appear on the face of the statements of comprehensive income . . . ."  *Id.* § 210.5-03(a).

Rule 5-03 requires that the issuer "state separately" on the face of the statements of comprehensive income the following five classes of "net sales and gross revenues":

> (a) Net sales of tangible products (gross sales less discounts, returns and allowances), (b) operating revenues of public utilities or others; (c) income from rentals; (d) revenues from services; and (e) other revenues.

17 C.F.R. § 210.5-03.1.

The Rule also requires the issuer to disclose "[c]osts and expenses applicable to sales and revenues," and requires that the issuer "[s]tate separately the amount of":

> (a) cost of tangible goods sold, (b) operating expenses of public utilities or others, (c) expenses applicable to rental income, (d) cost of services, and (e) expenses applicable to other revenues

17 C.F.R. § 210.5-3.2.  "If income is derived from more than one of the subcaptions described under § 210.5-03.1, each class which is not more than 10 percent of the sum of the items may be combined with another class.  If these items are combined, related costs and expenses as described under § 210.5-03.2 shall be combined in the same manner."  17 C.F.R. § 210.5-3(b).

By the terms of the regulation, an issuer must include costs and revenues for "services" on the face of its statements of comprehensive income so long as it derives more than ten percent of its income from those "services." The regulation does not define "services." *See id.* § 210.1-02 ("Definitions of Terms Used in Regulation S-X"). Absent a definition, a court "must give [the relevant term] its ordinary meaning . . . ." *United States v. Kelly*, 128 F.4th 387, 418 (2d Cir. 2025*); cf. Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms." (internal citation omitted)). "Service" is "the performance of some useful act or series of acts for the benefit of another, usually for a fee." *Service*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Service*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/service (last accessed July 25, 2026) (defining service as "useful labor that does not produce a tangible commodity").

Here, Lead Plaintiff has adequately pleaded that the comprehensive statements income in the Registration Statement did not "state separately" costs of "services" as required by Rule 5-03(b)(2). The Registration Statement identified four lines of business:

> (i) the sale of software products and service; (ii) maintenance and support ("M&S") service; (iii) the sale of hardware products; and (iv) the sale of cloud platform products

SAC ¶ 65. "M&S service is 'for software products contracts and consists of unspecified future software updates, upgrades, and enhancements as well as technical product support services, and the provision of unspecified updates and upgrades'—i.e., the provision of services[.]" SAC ¶ 66 (quoting Registration Statement). A plausible reading of the description of M&S service in the Registration Statement is that M&S service constituted a "service" within the meaning of Rule 5-03, because it constituted "useful labor that did not produce a tangible commodity" or "the performance of . . . a series of useful acts."

"M&S service" constituted more than 10% of Xiao-I's revenue for the year ending

December 31, 2020 and the six month periods ending June 30, 2021 and June 30, 2022. *See* Registration Statement at F-19, F-51; *see also* SAC ¶¶ 82–85. It follows that, for those periods, "revenues from services" exceeded 10% of total revenue. *Id.* Thus, for at least those periods, Xiao-I was obligated to "state separately the amount of . . . cost of services." 17 C.F.R. § 210.5-03.2(d). "Xiao-I failed to include cost of revenues by product or service revenue class" on the face of its statements of comprehensive income. SAC ¶ 76; *see also id.* ¶¶ 72–73. Thus, Lead Plaintiff has adequately pleaded that the Registration Statement failed to include the information required by Regulation S-X.

Defendants argue that Regulation S-X did not obligate them to disclose costs of any of its lines of business. They first argue that Regulation S-X only "establishes broad cost categories but does not mandate that these categories precisely mirror every revenue line item a company choses to disclose." Reply at 7. They also cite to the SEC Letter for the proposition that their decision to report costs in the aggregate did not violate any "mandatory requirement." *Id.* While Rule 5-03(b)(2) does not require that Xiao-I report of costs that "precisely mirror" the revenue line items it chooses to disclose, that is irrelevant. As described above, the text of the regulation requires that Xiao-I separately disclose revenue and costs from enumerated classes of revenues if they constituted more than 10% of the Company's revenue. Lead Plaintiff alleged that Xiao-I derived more than 10% of its revenue from at least one of those enumerated classes—namely, services. Therefore, Xiao-I was obligated to disclose "revenues from services" and "costs of services." It did not include either line item on the face of the statements of comprehensive income.[10]

---

[10] Defendants also argue that Plaintiff "relies on" accounting standards "for the proposition that cost breakdowns are required." Reply at 6–7 (citing SAC ¶¶ 73–75). Lead Plaintiff pleads these facts in support of its argument that the omitted information was material. *See* SAC ¶¶ 73–75; Opp'n at 20. Further, in the case on which Defendants rely in support of their argument that accounting violations cannot support a securities fraud claim—*Harris v. AmTrust Financial Services, Inc.*—the plaintiff asserted that the defendant violated Section 10(b) solely because the reporting of financial information violated generally accepted accounting principles ("GAAP"). 135 F. Supp. 3d 155, 171–72 (S.D.N.Y. 2015), *aff'd* 649 F. App'x 7 (2d Cir. 2016). Here, Lead Plaintiff is asserting a violation of an SEC regulation as an actionable omission under Section 11.

Defendants' argument concerning the SEC Letter are unpersuasive. They assert that because the SEC "merely requested that Xiao-I consider Section 210.5.03(b)(2)," the SEC did not believe that any "mandatory requirement was violated." Reply at 7. First, the SEC Letter was in response to the Annual Report, not the Registration Statement. *See generally* SEC Response. Lead Plaintiff cannot state a claim under Section 10(b) solely based on Xiao-I's alleged failure to comply with relevant SEC regulations in preparing its Annual Report. *See Macquarie Infrastructure Partners*, 601 U.S. at 264. Lead Plaintiff can, however, state a Section 11 claim based on Xiao-I's alleged failure to comply with relevant SEC regulations in preparing offering documents. *Id.* Thus, the fact the SEC was commenting on Annual Report—and not the Registration Statement—undercuts Defendants' argument that the comments in the SEC Letter bear on whether Xiao-I violated a mandatory requirement in filing the Registration Statement.

Second, even assuming that the SEC's comments on the Annual Report applied to the Registration Statement, the SEC did not "merely request" that Xiao-I "consider" Regulation S-X. The SEC directed Xiao-I to "revise [the consolidated financial statements in the Annual Report] to state separately the cost of products sold and cost of services for the periods presented." SEC Response at 3. In the next sentence, the SEC asked Xiao-I to "*refer to* Rule 5-03(b)(2) of Regulation S-X." SEC Response at 3 (emphasis added). Refer and consider carry different meanings. *Compare Refer,* BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "refer" as "[t]o have recourse or appeal to; to consult, check, or examine"), *with Consider*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/consider (last accessed July 25, 2026) (defining "consider" as "to take into account"). As described above, Rule 5-03(b)(2) requires that the issuer report costs for certain enumerated classes of revenue, including "tangible goods sold" and "services." 17 C.F.R. § 210.5-03.2. Therefore, the SEC's comment can be construed as a request for Xiao-I to revise its financial statements to report "cost of products sold and cost of services,"

42

and to "consult" Rule 5-03(b)(2) and the categories enumerated therein to understand how to properly comply with the request, not to merely take the rule into account. Applying that reading to the Registration Statement, the SEC's Letter undercuts Defendants' position that it was not obligated to report "cost of services" in the Registration Statement.[11]

Lead Plaintiff has adequately pleaded that the omissions in the Registration Statement Aggregated Costs Statements are material. Lead Plaintiff alleges that the information omitted from the Registration Statement "allows investors to make determinations about gross margin," "an important financial metric to investors . . . ." SAC ¶¶ 73–74. In particular, Lead Plaintiff alleges that gross margin is "especially important for [Emerging Growth Companies], like Xiao-I, because . . . gross margin provides insight into whether the business endeavor . . . is indeed profitable . . . ." *Id.* ¶ 74. In support of her allegation that gross margin is an important metric, Lead Plaintiff cites the Financial Accounting Standards Board's Accounting Standards Codification No. 220, which states that "if used with related disclosures and other information in the financial statements, the information provided by reporting comprehensive income should assist investors, creditors, and others in assessing an entity's activities and entity's future cash flows." *Id.* ¶ 75 (internal quotations and brackets omitted). Drawing all inferences in Lead Plaintiff's favor, the Court cannot conclude that the omission of information required by Rule 5-03 of Regulation S-X was "so obviously unimportant to a reasonable investor" so as to support dismissal for failure to plead materiality. *In re ProShares*, 728 F.3d at 102.

Defendants' arguments to the contrary rely on inapposite authority. Defendants principally argue that the omission was immaterial as a matter of law because the reported numbers were accurate aggregate results. Mem. at 26–27. In support of this proposition, Defendants cite to *Yaroni*

---

[11] Notably, it appears that Xiao-I understood that to be the SEC's request: it revised its comprehensive statements of income to include costs of revenue for each of the Company's lines of business. *See* SAC ¶ 85.

43

*v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385 (S.D.N.Y. 2022).  In that case, the plaintiff alleged

that financial statements that were later restated were misleading.  *See generally id.*  However, the

plaintiff only stated in "conclusory" terms that "the changes in financial results were material to

investors."  *Id.* at 402 (quoting the plaintiff's complaint).  As it related to line items that had changed

from the original statement to the restatement, the plaintiff "provide[d] no argument at all for why

[those] particular line items would be important for investors to consider."  *Id.* at 403.  Here, as

described, Lead Plaintiff has alleged specific facts to support her argument "for why these particular

line items would be important for investors to consider."  *Id.*  She alleges that the cost information

was required to calculate "gross margin," and alleges that understanding gross margin is important to

understand a company's profitability in the long term.  SAC ¶¶ 73–74.  She also alleges that the

profitability information is important for an investor evaluating an emerging growth company that

might have high up-front costs.  *Id.*  Accordingly, Lead Plaintiff has adequately pleaded that the

Registration Statement omitted material facts in contravention of affirmative legal disclosure

obligations.

### b.    Section 10(b) Claims

The Aggregated Costs Statements in both the Registration Statement and the Annual Report

are not actionable under Section 10(b) and Rule 10b-5.  "[A] violation of federal securities law

cannot be premised upon a company's disclosure of accurate historical data."  *Plumber & Steamfitters

Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021); *see also Ohio Pub. Emps. Ret.

Sys. v. Discovery, Inc.*, 715 F. Supp. 3d 483, 497 (S.D.N.Y. 2024) ("It is well settled . . . that a violation

of federal securities law cannot generally 'be premised upon a company's disclosure of accurate

historical data.'" (quoting *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38–

39 (2d Cir. 2012) (summary order)), *aff'd*, No. 24-646-CV, 2024 WL 4647131 (2d Cir. Nov. 1, 2024);

*accord DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 211 (S.D.N.Y.

2019) ("Multitudes of case law in this district foreclose any argument that accurate statements about past performance could be actionable under the securities laws."). Lead Plaintiff here does not contest the accuracy of Xiao-I's Aggregated Costs Statements.[12] For that reason alone, she cannot state a claim solely based on Xiao-I's reporting of accurate cost information in the aggregate.

Notwithstanding this well settled rule, Lead Plaintiff argues that the Aggregated Costs Statements were misleading in the absence of disclosure of costs of revenue for each of the Company's lines of business. She asserts that the Aggregated Costs Statements were misleading for three reasons: (1) they left investors without "required transparency regarding the embedded gross margin information by revenue class"; (2) they did not adequately provide insight into "the direction of the Company with respect to its varied revenue streams;" and (3) they created an "unduly favorable picture of the Company's business." Opp'n at 11–12; *see also* SAC ¶¶ 87, 117. The Court addresses each of these three theories in turn.

The first theory is squarely foreclosed by the Supreme Court's holding in *Macquarie Infrastructure Partners*. Lead Plaintiff argues that the Aggregated Costs Statements were misleading because they did not include the information required by Regulation S-X. *See* SAC ¶ 87; Opp'n at 11. In *Macquarie Infrastructure Partners*, the Court held that liability under Section 10(b) and Rule 10b-5(b) may not be premised solely for "fail[ure] to make mandated disclosures." 601 U.S. at 265. Instead, "the failure to disclose information required by [SEC regulations] can support a Rule 10b-5(b) claim *only if* the omission renders affirmative statements made misleading." *Id.* Thus, the fact that the Annual Report did not disclose the information required by Regulation S-X is not sufficient, standing alone, to state a Section 10(b) claim.

---

[12] For this reason, Lead Plaintiff's attempt to distinguish *Willard v. UP Fintech Holding Ltd.,* 527 F. Supp. 3d 609 (S.D.N.Y. 2021) is unavailing. Here, too, Lead Plaintiff "put[s] all of [her] proverbial eggs in the material-omission basket" because she does not plead that the Aggregated Costs Statements "contained *untrue* statements of material fact." *Id.* at 617 (emphasis added).

As it relates to the second and third theories, Lead Plaintiff has not pleaded sufficient facts to establish that a reasonable investor would have received a false impression from the Aggregated Costs Statements. Lead Plaintiff does not allege that the Aggregated Costs Statements—which solely consist of historical data in SEC filings—were inaccurate. As it relates to the second theory, she alleges that the absence of more granular cost data left investors with "confusion about the direction of the Company with respect to its varied revenue streams." SAC ¶ 87. However, the fact that additional information would have been useful data for an investor seeking insight into the direction of Xiao-I's business does not trigger a duty to disclose that data. *See Meyer*, 761 F.3d at 250 ("[T]here is no duty to disclose a fact . . . merely because a reasonable investor would very much like to know that fact." (internal quotation marks omitted)).

Finally, a reasonable investor reading the Aggregated Costs Statements in context would not be misled into believing that the gross margins of each of its lines of business were the same. Lead Plaintiff alleges that the omission of cost information by revenue stream created an "unduly favorable picture of the Company's business" because the Aggregate Cost Statements omitted that "there [was] a large disparity in the costs of revenues across Xiao's varied revenue streams." SAC ¶¶ 87–88. However, here, Xiao-I—unlike *Macquarie*'s famous hypothetical child who failed to disclose that he had eaten an entire cake—disclosed that its lines of business had different profit margins. Both the Annual Report and the Registration Statement included a section entitled "Gross Profit and Gross Profit Margin," in which Xiao-I disclosed that it "ha[s] different types of products and services that have different profit margins." Registration Statement at 101; Annual Report at 76. If each of Xiao-I's "products and services" had different profit margins, it followed that the profit margin for every line of business could not be equal to an aggregate profit margin calculated using aggregate revenue and aggregate costs. Therefore, a reasonable investor would not be misled that the costs of revenues were equivalent across lines of business. Accordingly, the omission of

46

that granular data was not an actionable half-truth. *See Ohio Pub. Emps. Ret. Sys.*, 715 F. Supp. 3d at 497 (holding that streaming company's disclosure of subscribers was not misleading even though company did not disclose how many users were "unactivated" where the "subscriber numbers . . . were accurate and were accompanied by" disclosures that the company "included unactivated accounts" in its metrics); *see also In re Eros Int'l Secs. Litig.*, No. 15-CV-8956, 2017 WL 6405846, at *6 (S.D.N.Y. Sept. 22, 2017) (Nathan, J.) (similar), *aff'd*, 735 F. App'x 15 (2d Cir. 2018); *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161 (E.D.N.Y. 2017) (similar), *aff'd*, 731 F. App'x 35 (2d Cir. 2018). Thus, none of Lead Plaintiff's allegations justify departure from the rule that "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Plumber & Steamfitters Loc. 773 Pension*, 11 F.4th at 99 (internal citation omitted).

The only case Lead Plaintiff relies on for the proposition that the disclosure of accurate historical data can be misleading is factually inapposite. *See* Opp'n at 12 (citing *In re Sturm, Roger & Co. Securities Litigation*, No. 3:09-cv-1293, 2011 WL 494753 (D. Conn. Feb. 7, 2011)). In *In re Sturm*, the defendant corporation had changed business strategies. 2011 WL 494753, at *4. The plaintiffs alleged that the new strategy had resulted in several issues, including in "the company's inability to meet shipping schedules." *Id.* Therefore, they alleged that a statement reporting that order backlog had "*increased*" was misleading without the additional disclosure that the increase was the result of production slowdowns because it would otherwise imply that demand had increased. *Id.* at *6. The court held that "statements about *increased* demand, *improved* net income, *increased* orders and order backlogs, *decreased costs* of products sold, and *increased* shipments" were materially misleading because they "paint[ed] a rosy picture of [the defendant's] new business model, but it neglected to depict some of the thorns." *See id.* at *7 (emphases added).

Here, both the nature of the challenged statements and the context in which those statements were made are different. In *In re Sturm*, the challenged statements did not just report

47

historical data but also described changes in the company's performance. They were misleading because they omitted information undercutting the positive impression that the numbers and the description would give a reasonable investor. Here, the statements are the data itself without any further description. In *In re Sturm*, the plaintiffs pleaded several undisclosed facts that were contradictory to the facts implied by the statements. Here, the only fact that Lead Plaintiff alleged was inconsistent with the impression a reasonable investor would receive from the Aggregated Costs Statements is the "large disparity" in gross margin across Xiao-I's lines of business. But, at discussed, the Registration Statement and the Annual Report disclosed that the gross margins were different across its lines of business.

Accordingly, the Aggregated Costs Statements are not actionable under Section 10(b) and Rule 10b-5.

### 4.    SOX Certifications

The SOX Certifications are nonactionable statements of opinion.[13] Both statements are statements of opinion, rather than fact. "[S]ubjective statements of opinion are generally not actionable as fraud." *Afr. v. Jianpu Tech. Inc.*, 2022 WL 4537973, at *5 (S.D.N.Y. Sept. 28, 2022) (quoting *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)). The Supreme Court has emphasized that it is "no small task for an investor" to meet the standard for pleading an actionable statement of opinion. *Omnicare, Inc. v.*

---

[13] The first statement is as follows:

> [Based on my knowledge, the Annual Report] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]

SAC ¶ 163; Dkt. No. 90-2 at 24. The second statement is as follows:

> [Based on my knowledge], the financial statements, and other financial information included in [the Annual Report], fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report[.]

SAC ¶ 163; Dkt. No. 90-2 at 24.

*Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). "In general, a fact is 'a thing done or existing or an actual happening,' while an opinion is 'a belief, a view, or a sentiment which the mind forms of persons or things.'" *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 40 (2d Cir. 2023) (quoting *Omnicare*, 575 U.S. 175 at 183). A statement of fact "'expresses certainty about a thing,' while a statement of opinion does not." *Id.* (quoting *Omnicare*, 575 U.S. at 183). "Statements of opinion often include qualifying language (like 'I believe' or 'I think') that conveys a lack of certainty about the thing being expressed, marks the statement as reflecting the speaker's impression or point of view rather than an objective truth, and makes it easier to identify the statement as one of opinion rather than fact." *Id.* at 40–41 (quoting *Omnicare*, 575 U.S. at 183–84).

Here, the SOX Certifications reflected Defendants Yuan and Weng's views of the statements in the Annual Report. The first was an evaluation of the truthfulness of the statements in the Annual Report and their capacity to mislead. The second was an evaluation of the accuracy and completeness of the financial information in the Annual Report. Both statements "contained an important qualification: that the certifying officer's statements were true 'based on [his] knowledge.'" *Diabat v. Credit Suisse Grp. AG*, No. 23 CIV. 5874, 2024 WL 4252502, at *63 (S.D.N.Y. Sept. 19, 2024) (collecting cases); *see also New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 47 (holding that SOX Certifications that contained the same qualification were statements of opinion). Accordingly, both SOX Certifications were statements of opinion.

The SOX Certifications were not actionable statements of opinion. "Statements of opinion are actionable if (1) the speaker did not hold the belief she professed, (2) the supporting facts she supplied were untrue, or (3) the speaker omitted information whose omission makes the statement misleading to a reasonable investor." *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 43 (2d Cir. 2025), *cert. denied sub nom. Shanda Games Ltd. v. Monk*, 146 S. Ct. 366 (2025) (internal citations,

quotations, and alterations omitted).  "In other words, when a statement of opinion implies facts or

the absence of contrary facts, and the speaker knows or reasonably should know of different

material facts that were omitted, liability under Rule 10b-5 may follow."  *Abramson v. Newlink Genetics*

*Corp.*, 965 F.3d 165, 175 (2d Cir. 2020).  With respect to the second basis for challenging a statement

of opinion, a plaintiff must show that "the embedded fact is not one as to which reasonable minds

can differ."  *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 42.  And "[w]ith

respect to th[e] [third] basis for challenging a statement of opinion, *Omnicare* held that the

appropriate perspective for identifying whether a statement of opinion implies facts is that of the

reasonable investor."  *Id.*  A reasonable investor "expects not just that [the speaker] believes the

opinion (however irrationally)," *Omnicare*, 575 U.S. at 188–89, but that it "rest[s] on some meaningful

. . . inquiry," "fairly align[s] with the information in the issuer's possession at the time," and does not

"reflect baseless, off-the-cuff judgments," *New England Carpenters Guaranteed Annuity & Pension Funds*,

122 F.4th at 41 (citation modified) (quoting *Omnicare*, 575 U.S. at 188–90).

Lead Plaintiff has not pleaded facts to establish that the SOX Certifications were actionable

under any of the three bases to challenge statements of opinion.  She does not allege that

Defendants Yuan and Weng did not believe the opinions expressed in the SOX Certifications.[14]  She

also does not plead sufficient facts to establish that the embedded facts in each statement were

untrue.  As it relates to the first statement—and as detailed above—Lead Plaintiff has not pleaded

that sufficient facts to establish that the Annual Report "contain[e]d any untrue statement of

---

[14] To the extent that Lead Plaintiff argues that Defendants Yuan and Weng's statements are actionable because they incorrectly assessed whether the Annual Report was complete in its presentation of the results of operations in "all *material* respects," SAC ¶ 163 (emphasis added), that alone is insufficient to state a claim based on an opinion statement. *See New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 47 (holding that defendant corporation's acknowledgment that its internal controls had failed did not, "standing alone," render prior SOX Certification of "their disclosure of any weaknesses in internal controls over the company's financial reporting" by corporation's executive actionable); *Tongue*, 816 F.3d at 212 ("[A] statement of opinion is not misleading just because external facts show the opinion to be incorrect.").

50

material fact or omit[ted] to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading . . . ."  SAC ¶ 163 (quoting first statement).  As it relates to the second, Lead Plaintiff does not allege that the "financial statements, and other financial information included in" the Annual Report, *id.*, were inaccurate.  *See Diabat*, 2024 WL 4252502, at *63.

Finally, with respect to the third basis for challenging a statement of opinion, Lead Plaintiff does not plead facts to show that Defendants Yuan and Weng omitted information that made the SOX Certifications misleading to a reasonable investor.  Lead Plaintiff alleges that both SOX Certifications were materially false or misleading because they omitted the fact that the Annual Report "made misleading statements and/or failed to disclose" several categories of information.[15] However, none of these omitted items were "about [Defendants Yuan and Weng's] inquiry into or knowledge concerning [Defendants Yuan and Weng's] statement of opinion."  *New England*

---

[15] In particular, Lead Plaintiff alleges that the SOX Certification Statements were materially false or misleading because "the 2022 20-F made misleading statements and/or failed to disclose:"

> (i) the true scope and severity of risks that Xiao-I faced due to certain of its Chinese shareholders' non-compliance with Circular 37 Registration, including the Company's potential inability to use Offering proceeds for its intended business purposes, which was in violation of Item 105 of SEC Regulation S-K
>
> (ii) Xiao-I's costs of revenues by product or service revenue class;
>
> (iii) that Xiao-I's failure to sufficiently report such information pertaining to its costs of revenues by product or service revenue class was in contravention of the express requirements set out in Section 210.5-03(b)(2) of Regulation S-X;
>
> (iv) that the Company's obfuscation of pertinent gross margin measures and metrics (that would otherwise be considered key performance indicators for a company) left investors in the dark as to which of Xiao-I's revenue segments were least profitable (which was the essence of the required disclosure under Section 210.5-03(b)(2) of Regulation S-X) and called into question whether management and the Board had been/were being transparent about the direction of the Company;
>
> (v) that the omission of such material facts rendered the Company's statements regarding "costs of revenues" misleading as half-truth statements; and
>
> (vi) as a result, made the 2022 20-F materially false and/or misleading.

SAC ¶ 164.

*Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 41–42.  Thus, Lead Plaintiff has not

pleaded sufficient facts to establish that the SOX Certifications were actionable under Section 10(b).

*See New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 47 (holding that

Defendants' SOX certifications were non-actionable opinions in part because "the Complaint fails

to allege any facts that establish a lack of meaningful inquiry, other than the fact that the certification

turned out to be wrong").

Accordingly, Lead Plaintiff has not pleaded sufficient facts to establish that any of the

statements she challenges were misleading half-truths.

### C.    Liable Parties Under Section 11 and Section 15 of the Securities Act

Lead Plaintiff has adequately pleaded that the Securities Act Defendants are liable under

Section 11 of the Securities Act, but she has only pleaded sufficient facts to establish that

Defendants Yuan and Weng are liable under Section 15 of the Securities Act.  Section 11 liability

extends to both "every person who signed the registration statement," but also to "every person

who, with his consent, is named in the registration statement as being or about to become a

director."  *See* 15 U.S.C. § 77k(a)(1), (3).  In addition, liability extends to "every underwriter with

respect to" the securities issued in the offering.  *Id.* § 77k(a)(1)(5).  Section 11 "places a 'relatively

minimal burden' on a plaintiff," which is met "[s]o long as plaintiffs plausibly allege that [the

defendant] omitted material information that it was required to disclose or made material

misstatements in its offering documents."  *Litwin*, 634 F.3d at 716, 718.  Thus, Lead "Plaintiff[] need

not allege scienter, reliance, or causation."  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,

752 F.3d 173, 182 (2d Cir. 2014).  "Consistent with those principles and the text of the Securities

Act, numerous district courts in this Circuit have explained that plaintiffs are not required to allege

that defendants in Section 11 and Section 12 claims knew, or should have known, of any material

omitted facts or misstatements at the pleading stage."  *Winter v. Stronghold Digital Mining, Inc.*, 686 F.

Supp. 3d 295, 306 (S.D.N.Y. 2023) (collecting cases).

"Section 15, in turn, creates liability for individuals or entities that 'control[ ] any person liable' under section 11 or 12." *In re Morgan Stanley*, 592 F.3d at 358 (citing 15 U.S.C. § 77o). "Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12." *Id.* (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996)). "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *First Jersey Sec., Inc.*, 101 F.3d at 1472–73; *see also In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) ("Because § 15 and § 20(a) are roughly parallel control person provisions under the 1933 and 1934 Acts, respectively, we here adopt the quoted *First Jersey* definition of control for § 15 claims." (citing 15 U.S.C. § 77o(a))). "Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (citing *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999)).

Lead Plaintiff has adequately pleaded that the Securities Act Defendants are liable under Section 11. As detailed above, Lead Plaintiff has pleaded that the Registration Statement failed to include information required by Rule 5-03(b)(2) of Regulation S-X. Lead Plaintiff alleged that Defendants Yuan, Weng, and Chen "signed or authorized the signing of the Registration Statement." SAC ¶¶ 34–36. And Lead Plaintiff alleged that each of Defendants Wu, Xu, Lin, and Sherman was named a "Director-nominee" and signed (or authorized the signing of) "a written consent, filed with the Registration Statement." *Id.* ¶¶ 37–40. Therefore, these individuals were "person[s] who, with [their] consent, [were] named in the registration statement as . . . about to become . . . director[s] . . . ." *See* 15 U.S.C. § 77k(a)(3).

53

Lead Plaintiff has adequately pleaded that the Underwriter Defendants are liable under Section 11. Section 11 "'imposes . . . negligence liability on underwriters[]' for material misstatements or omissions in a registration statement." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 99 (2d Cir. 2017) (quoting *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156 (2d Cir. 2012)). The omission at issue here is the omission of cost data for Xiao-I's lines of business. Lead Plaintiff alleges that each of the Underwriter Defendants acted as underwriters in the offering. *Id.* ¶¶ 43–46. Lead Plaintiff also alleges that the Underwriter Defendants undertook a due diligence investigation in preparing the Registration Statement. *Id.* ¶ 52. She alleged that the Underwriter Defendants were negligent in failing to conduct a reasonable investigation, which would have revealed that the Registration Statement omitted material facts that are required to be stated therein. *Id.* ¶¶ 54–56. In support of that allegation, she alleges that the Underwriter Defendants had "access to internal, confidential, current corporate information concerning Xiao-I's most up-to-date operational and financial results and prospects." SAC ¶ 52. She also alleges that agents of the Underwriter Defendants "reached understandings with" Xiao-I's executives as to various aspects of the IPO, including the "the language to be used in the Registration Statement" and "what disclosures about Xiao-I's business and operations would be made in the statement." *Id.* ¶ 53. Therefore, she has plausibly pleaded that the Underwriter Defendants were negligent in their preparation of the offering documents because they had access to the data that Lead Plaintiff alleges was omitted and participated in the selection of information to be included in the Registration Statement. *Compare Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 799 F. Supp. 3d 310, 351 (S.D.N.Y. 2025) (denying underwriters' motion to dismiss and noting that the plaintiff's "core allegation against the Underwriter Defendants is that they failed to conduct a 'reasonable and diligent investigation' into the accuracy of the Registration Statement and Prospectus."), *with Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc.*, 714

F. Supp. 2d 475, 483–84 (S.D.N.Y. 2010) (granting underwriter's motion to dismiss where only allegation was that underwriter, "in some unspecified way," "participated in the drafting and dissemination of the Prospectus Supplements."). Accordingly, Lead Plaintiff has adequately pleaded that all Securities Act Defendants are liable under Section 11.

Lead Plaintiff has only adequately pleaded that the Defendants Yuan, Weng, and Chen had the requisite control to establish liability under Section 15. For the time period relevant to the complaint, Defendant Yuan was Xiao-I's Chairman of the Board of Directors and its CEO. SAC ¶ 34. Defendant Weng was Xiao-I's CFO. *Id.* ¶ 35. Defendant Chen was a Director on the Board of Directors. *Id.* ¶ 36. All three "signed or authorized the signing of the Registration Statement." *Id.* ¶¶ 34–36. "At the pleading stage, this is sufficient to make out a Section 15 control claim against [them]." *Handal v. Tenet Fintech Grp. Inc.*, No. 21-CV-6461, 2023 WL 6214109, at *10 (E.D.N.Y. Sept. 25, 2023); *see also In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) (holding that allegations that individual defendants were officers and signed the registration statements at issue sufficient to "satisfy Plaintiffs' obligation to plead control").

However, Defendants Wu, Xu, Lin, and Sherman were not yet officers at the time the Registration Statement was filed, and Lead Plaintiff has not alleged that they signed the Registration Statement. They were named "Director-nominee[s]" in the Registration Statement and "signed or authorized the signing *of a written consent pursuant to SEC[] Rule 438* . . . to be named as . . . Director-nominee[s] in the Registration Statement." SAC ¶¶ 37–40 (emphasis added). The only other allegation that references their control is a conclusory statement that they were "controlling persons of Xiao-I within the meaning of Section 15" "by virtue of their offices, directorship, and specific acts." *Id.* ¶ 140. Lead Plaintiff does not identify any specific acts, nor does she identify how their position as nominees to a directorship conferred any "power to direct or cause the direction of the management and policies of a person." *First Jersey Sec., Inc.*, 101 F.3d at 1472–73. Accordingly, while

55

the motion to dismiss the Section 15 claims against Defendants Wu, Xu, Lin, and Sherman must be granted, the motion must be denied as it relates to Defendants Yuan, Weng, and Chen.

### D.    Section 20(a) of the Exchange Act

Lead Plaintiff has not adequately pleaded a Section 20(a) claim for control person liability. To plausibly allege a claim for control person liability, a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108) (internal quotation marks omitted). As discussed above, Lead Plaintiff has not plausibly pleaded a primary violation under Section 10(b). Consequently, the Lead Plaintiff has not stated a plausible claim for control person liability under Section 20(a).

## IV.    LEAVE TO AMEND

Defendants' motion to dismiss is granted in part with leave to amend as described below. Under Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). Additionally, "[w]hile leave to amend under the Federal Rules of Civil Procedure is 'freely granted,' . . . no court can be said to have erred in failing to grant a request that was not made." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 126 (2d Cir. 2013); *see also Malgieri v. Ehrenberg*, No. 12-CV-2517, 2012 WL 6647515, at *9 (S.D.N.Y. Dec. 21, 2012). ("a district court has no obligation to grant leave to amend *sua sponte*").

The Court will not grant Lead Plaintiff leave to amend her complaint with respect to her Section 11 and Section 10(b) claims arising from the Circular 37 Statements and the Aggregated

56

Costs Statements.  Lead Plaintiff has had the benefit of Defendants' views of the pleading deficiencies in the first amended complaint upon receipt of their first motion to dismiss.  *See* Dkt. No. 68.  That motion identified that same pleading deficiencies with respect to the Circular 37 Statements and the Aggregated Costs Statements—namely, that Xiao-I disclosed the risk of that it might not be able to use the proceeds of its IPO for their intended business purpose and that the Aggregated Costs Statements were accurate historical data.  *See generally id.*  Lead Plaintiff has not cured these deficiencies in her second amended complaint.  Nor does her second amended complaint identify other legal theories that can support her Section 11 and Section 10(b) claims with respect to the Circular 37 Statements and her Section 10(b) claim with respect to the Aggregate Costs Statements.  Accordingly, the Court dismisses the Section 10(b) claims and the Section 11 claim arising out of the Circular 37 Statements and the Section 10(b) claims arising out of the Aggregated Costs Statements with prejudice.  *See e.g., Brown v. Cerberus Capital Mgmt., L.P.,* 703 F. App'x 11, 15 (2d Cir. 2017) (summary order) (affirming district court's denial of leave to amend where a plaintiff "enjoyed a full opportunity to amend, having been apprised of Defendants' views of the original complaint's shortcomings").

However, the Court cannot conclude that Lead Plaintiff would be unable to cure the pleading deficiencies with respect to the SOX Certifications.  Defendants' original motion did not specifically address the pleading deficiencies with respect the SOX Certifications.  *See generally* Dkt. No. 68.  The Court's ruling is the first time Lead Plaintiff has been apprised of the pleading deficiencies with respect to those statements.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,* 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").  As described above, Lead Plaintiff has not pleaded that the speakers of those statements did not hold the beliefs professed when making them, nor has she pleaded

57

adequate facts to establish that the statements were misleading because they omitted to state facts concerning the speakers' inquiry into or knowledge concerning their statement of opinion. The Court's ruling is the first time Lead Plaintiff has been apprised of these pleading deficiencies.

The Court also cannot conclude that Lead Plaintiff would be unable to cure the pleading deficiencies with respect to her Section 15 claims against Defendants Wu, Xu, Lin, and Sherman. Defendants' first motion to dismiss argued that Lead Plaintiff failed to state a claim under Section 15 because she had not stated a claim for a primary violation under Section 11. *See* Dkt. No. 68 at 32. Thus, the Court's ruling is the first time Lead Plaintiff has been apprised of the pleading deficiencies with respect to her allegations that Defendants Wu, Xu, Lin, and Sherman had "control" over any primary violator.

Accordingly, the Court grants Lead Plaintiff leave to file a third amended complaint solely to cure the deficiencies identified with respect to the SOX Certifications and with respect to her Section 15 claims against Defendants Wu, Xu, Lin, and Sherman. Any amended complaint must be filed no later than fourteen days from the entry of this order.

## V.    CONCLUSION

Defendants' motion to dismiss the second amended complaint is granted in part and denied in part. Defendants' motion is granted with respect to Lead Plaintiff's claims arising under the Exchange Act. The motion to dismiss the Section 11 claim is denied with respect to the Registration Statement Aggregated Costs Statements, but the motion is granted with respect to the Registration Statement Circular 37 Statements. The motion to dismiss the Section 15 claim is granted with respect to Defendants Wu, Xu, Lin, and Sherman, but denied with respect to Defendants Yuan, Weng, and Chen.

Except for the Section 10(b) claim arising out of the SOX Certifications and the Section 15 claims against Defendants Wu, Xu, Lin, and Sherman, all dismissals are with prejudice. Any

amended complaint to cure the deficiencies as specified above must be filed no later than fourteen days from the entry of this order.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 88.

SO ORDERED.

Dated: August 7, 2026

_____
GREGORY H. WOODS
United States District Judge